**BLUEBONNET SAVINGS BANK, FSB, Stone Capital, Inc., and James M. Fail, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 95–532C.

United States Court of Federal Claims.

July 6, 2000.

I. Thomas Bieging, Washington, D.C., attorney of record for plaintiffs Bluebonnet Savings Bank, FSB and Stone Capital, Inc., and of counsel to plaintiff James M. Fail. Catherine Grainger and Sada Manickam, of counsel.

Mitchell R. Berger, Washington, D.C., attorney of record for plaintiff James M. Fail, and of counsel to plaintiffs Bluebonnet Savings Bank, FSB and Stone Capital, Inc. Michael J. Schaengold and Michael N. Druckman, of counsel.

Elizabeth Marie Hosford, Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General David W. Ogden, for defendant. David M. Cohen, Director, and Mark A. Melnick, Assistant Director. Kenneth Dintzer, Henry R. Felix, Craig Gottlieb, Renee Brooker, David Hoffman and Tonia Tornatore, of counsel.

## OPINION

FUTEY, Judge.

This case is before the court following a trial on the merits on the issue of damages. In a previous decision on the issue of liability, Chief Judge Smith held that the passage of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (FIRREA), and its implementing regulations and related agency actions, breached the capital plan, subordinated debenture (subordinated debt) and div-

idend forbearances granted to plaintiffs James M. Fail, Stone Capital, Inc.,[1] and Bluebonnet Savings Bank (Bluebonnet) in an Assistance Agreement entered with the Federal Savings and Loan Insurance Corporation (FSLIC). *Bluebonnet Sav. Bank v. United States,* 43 Fed.Cl. 69, 80 (1999). Plaintiffs claim that defendant's breach of these three forbearances caused them to incur $175,882,000 in damages. Defendant counters that plaintiffs' alleged damages were not foreseeable, that the breaches did not cause their alleged damages, and that plaintiffs failed to prove their alleged damages with reasonable certainty.

### Factual Background [2]

The savings and loan industry in the southwestern United States in the late 1980's was in a state of crisis. By the middle of that decade the real estate industry rapidly deteriorated, inflicting severe financial losses on thrifts that owned, or loaned money for the purchase of, real estate.[3] In addition, the savings and loan industry in the Southwest contained more thrift branches "than was necessary to serve the people ... and still provide competition within the respective communities ...."[4] Hundreds of thrifts at the time were either insolvent or on the verge of insolvency, and FSLIC lacked sufficient funds to liquidate all the troubled thrifts. In an effort to address this multibillion dollar problem, the Federal Home Loan Bank Board (FHLBB) approved the "Southwest Plan" on February 3, 1988.[5] The Southwest Plan was a program "to provide government assistance to induce private capital investors to bail out failed [savings and loans] in the southwestern United States." *Bluebonnet Sav. Bank v. Fed. Deposit Ins. Corp.,* 891 F.Supp. 332, 333–34 (N.D.Tex. 1995). Under this program, FHLBB grouped insolvent thrifts into packages for sale to investors, which theoretically would save FSLIC the cost of liquidating all of the insolvent thrifts in the region. In order to attract private investors, FHLBB offered a wide variety of incentives, including guaranteed assistance payments, regulatory forbearances, and shared tax benefits. The goal of the Southwest Plan was to attract new capital and management to the thrift industry, eliminate branch redundancies, and reduce the operating expenses of failing thrifts.[6]

Mr. Fail first became interested in purchasing a Southwest Plan thrift package in November 1988. Mr. Harry T. Carneal, Executive Vice President of the Lifeshares Group, Inc. (Lifeshares), an insurance company owned by Mr. Fail, met with FSLIC personnel on behalf of Mr. Fail to discuss Mr. Fail's desire to purchase a Southwest Plan thrift package. In early November 1988, Mr. Carneal was introduced to Sidney Steiner, the principal shareholder of the S/D Acquisition Group. Mr. Steiner, together with Mr. John Kirchhofer, one of his business representatives, had been attempting throughout 1988 to acquire the "Pard/Rose" package, a Southwest Plan package comprised of fifteen insolvent thrifts that eventually became Bluebonnet. Mr. Steiner and Mr. Kirchhofer had been unsuccessful in their attempts due to a lack of capital needed to complete the acquisition. In mid-November 1988, Mr. Fail, on behalf of Lifeshares, and Mr. Steiner, on behalf of the S/D Acquisition Group, entered a partnership (the Fail Group) to join efforts to acquire the Pard/Rose package.

During that month the Fail Group met with FSLIC personnel to discuss their desire to acquire the Pard/Rose package. The Fail Group submitted a bid of $96 million for the Pard/Rose package, in which Mr. Fail

---

1. Stone Capital, Inc. (Stone) was formerly named CFSB Corporation until 1997. Therefore, the court shall refer to Stone as CFSB throughout this opinion.

2. The facts presented in this section are findings of the court. These findings, however, are made to provide a general factual background and are not all-encompassing. Additional findings will be made in the discussion sections that follow.

3. Plaintiffs' (Pls.') Exhibit (Ex.) 3. The terms "savings and loan" and "thrift" are used interchangeably in this opinion.

4. Trial Transcript (Tr.) at 3167.

5. Pls.' Ex. 3, at 1.

6. *Id.* at 1–2.

planned to infuse this amount over one year, in which Lifeshares would serve as the holding company for the new thrift. After submitting this bid, Mr. Fail, Mr. Steiner and Mr. Carneal met with Mr. Angelo Vigna, Assistant Principal Supervisor of the Federal Home Loan Bank of New York, to discuss the terms of their bid. During this meeting, Mr. Fail told Mr. Vigna that he planned to use assets held by two companies he owned, Mutual Security Life Insurance Company (MSL) and Farm & Home Life Insurance Company (Farm & Home) to fund the acquisition.[7] Mr. Vigna also held negotiations with the Weston Edwards Group, another prospective bidder for the Pard/Rose package.[8]

FSLIC ultimately chose to pursue a bid received from the Weston Edwards Group. FHLBB, however, did not accept that bid because the proposed holding company structure was unsatisfactory and that it did not believe Mr. Edwards could obtain the financing he needed to acquire the package. Consequently, in early December 1988, FSLIC personnel informed Mr. Fail that FHLBB rejected the Weston Edwards Group's bid, and asked him if he would submit a new bid for the Pard/Rose package.[9]

On December 12, 1988, the Fail Group submitted a new bid for the Pard/Rose package to FSLIC. The bid included a business plan in which Mr. Fail and CFSB, a newly created holding company owned by Mr. Fail, agreed to infuse $120 million into the resulting thrift over a two year period, in exchange for a specified amount of assistance from FSLIC.[10] This proposed assistance included the grant of a number of regulatory forbearances. The bid also listed the closing date as December 28 of that year, but FSLIC moved the date to December 22.[11]

Over a period of approximately three weeks, the Fail Group engaged in negotia-tions with personnel from FSLIC's Southwest Plan Office, along with personnel from the Federal Home Loan Bank of Dallas.[12] The majority of the negotiations, however, were conducted by Mr. Carneal and Mr. Robert Roe, an employee of the Southwest Plan Office and FSLIC's main negotiator for the Pard/Rose package. FSLIC, along with the Corporate and Securities Division of Office of General Counsel (CASD), reviewed the Fail Group's bid.

Late in the negotiations process FSLIC requested that Mr. Fail identify the source for a portion of his funding for the acquisition. In a letter to Mr. Stuart Root, Executive Director of FSLIC, dated December 21, 1988, Mr. Fail discussed his bid and reiterated his commitment to infuse $120 million into the resulting thrift (Fail letter). He also described a number of different means by which he planned to capitalize a portion of the infusion. In a letter to Mr. Root dated December 22, 1988, Mr. Carneal (Carneal letter) discussed the capitalization of the same portion of the infusion addressed in the Fail letter.

On December 22, 1988, Mr. Root provided FHLBB with a memorandum recommending that it accept the Fail Group's bid and approve the acquisition. Apparently on the same day, Ms. Jamie Brown, Assistant Deputy Director of CASD, provided FHLBB with a legal memorandum regarding the proposed acquisition (CASD Memo). Ms. Brown ultimately determined that FHLBB's approval of the acquisition would comply with the existing law. She noted, however, that plaintiffs had not yet identified a source for a portion of the acquisition funding. Ms. Brown thus recommended that FHLBB condition its approval based upon Mr. Fail's and CFSB's satisfactory identification to FSLIC of the source of funding for these infusions.

7. Defendant's (Def.'s) Ex. 19; Tr. at 950–51. Lifeshares is the owner of Farm & Home. Farm & Home is the owner of MSL. *See* Tr. at 1053, 1639–40.

8. *Id.* at 1252, 1469.

9. *See* Def.'s Ex. 741, at 01394.

10. Pls.' Ex. 32.

11. Tr. at 793.

12. Prior to the acquisition date, FHLBB transferred the responsibility for negotiating the Pard/Rose package from the Federal Home Loan Bank of New York to the FSLIC Southwest Plan Office. *Id.* at 3303–04.

At a meeting held on December 22, 1988, FHLBB issued resolution number 88–1384P, which approved the Fail Group's bid to acquire the Pard/Rose package. It determined that the Fail Group's bid presented the best economic value to the government. FHLBB, however, conditioned its approval based upon plaintiffs' identification of a portion of the funding as recommended by Ms. Brown in the CASD Memo. On that same date, Consolidated Federal Savings and Loan Association (later renamed Bluebonnet Savings Bank), was created as successor to certain assets and liabilities of the fifteen insolvent Texas thrifts comprising the Pard/Rose package.[13] Mr. Fail, through CFSB, acquired Bluebonnet from FSLIC.

Also on December 22, Bluebonnet, CFSB, and FSLIC entered into an Assistance Agreement, which formalized the terms of the bid. Pursuant to the Assistance Agreement, Mr. Fail and CFSB agreed to recapitalize Bluebonnet by infusing $120 million over a two year period, with $70 million due that day, and an additional $25 million due on the first and second anniversary dates. The Assistance Agreement required that one-half of the total infusion be raised through the sale of Bluebonnet-issued capital notes and one-half consist of equity. With respect to the initial $70 million, CFSB agreed to infuse $35 million into Bluebonnet through the purchase of Bluebonnet common stock. The remaining $35 million would be infused in the form of subordinated debt issued by Bluebonnet and to be purchased by Lifeshares or one of its affiliates.[14] The Assistance Agreement also required that CFSB purchase $12.5 million of Bluebonnet's common stock on each of the two successive anniversaries of the effective date, while Lifeshares would either purchase or place with an unaffiliated third party $12.5 million of subordinated debt each year.

In exchange, FSLIC agreed to provide assistance to Bluebonnet that exceeded $3 billion, which equaled the difference between the liabilities Bluebonnet assumed and the tangible assets it acquired. The assistance included, among other things, FSLIC promissory notes, asset coverage and yield maintenance. The FSLIC promissory notes together amounted to $760,200,-000, and equaled the combined negative net worth of the fifteen thrifts that comprised Bluebonnet. All assistance payments received were exempt from federal taxation, and thus Bluebonnet's earnings would not be taxable during the first ten years of operation.[15] The asset coverage guaranteed that FSLIC would cover any losses resulting from the sale or disposition of certain "covered assets" described in the Assistance Agreement. The yield maintenance guaranteed Bluebonnet a yield on all covered assets. This assistance was essential to ensure the financial viability of Bluebonnet.

FSLIC also received benefits from the acquisition. For example, FSLIC obtained a warrant for the purchase of Bluebonnet common stock at .01 per share, which could be exercised anytime after December 22, 1994. FSLIC also was entitled to a $10 million payment upon expiration of the Assistance Agreement. FSLIC further obtained a 25% share of all the tax benefits received by Bluebonnet on a consolidated basis.[16] FSLIC also could reduce its assistance obligation by its share of the tax benefits.

Mr. Fail, on his own behalf and on behalf of CFSB and Bluebonnet, entered into the Capital Maintenance Agreement (CMA) with FSLIC on December 22, 1988, which imposed a number of conditions upon CFSB and Bluebonnet concerning certain ownership and operation issues. Additionally, CFSB agreed to purchase and at all times own 100% of the voting stock (common stock)

---

**13.** Bluebonnet is a federally chartered savings bank insured by the Federal Deposit Insurance Corporation (FDIC).

**14.** The language of the Assistance Agreement actually provides that a company affiliated with CFSB would purchase capital notes from Bluebonnet. Pls.' Ex. 43, § 1(b), at 5.

**15.** Pls.' Ex. 74, at 4.

**16.** Pls.' Ex. 58, at F600118. FSLIC's share would increase to 50% provided that plaintiffs could associate with an investor capable of utilizing Bluebonnet's tax benefits and the consolidated taxable income exceeded $50 million. *Id.*

of Bluebonnet.[17] FSLIC obtained the right to seize Bluebonnet in the event CFSB failed to timely make the capital infusions or to maintain capital compliance.[18]

In connection with the acquisition, FHLBB simultaneously sent a letter to Mr. Fail, which granted Bluebonnet a number of regulatory forbearances, two of which are material to this dispute. First, FHLBB granted Bluebonnet a ten-year capital forbearance (capital plan forbearance) that allowed Bluebonnet to maintain capital levels lower than those required by regulation. This forbearance, however, required that Bluebonnet's capital requirement would increase each year. For example, Bluebonnet was required to maintain a ratio of regulatory capital to liabilities of 1.75% during its first year of operation. This ratio would increase to 2.0% the following year. The letter also included a dividend forbearance, which permitted Bluebonnet to pay cash dividends of up to 50% of its net retained earnings beginning December 23, 1989.[19] Significantly, this forbearance contained two important qualifications. First, Bluebonnet could only declare common stock dividends provided that it met the capital levels contained within the capital plan forbearance. Second, Bluebonnet could not declare common stock dividends if doing so would cause it to fall below these capital levels.[20]

Plaintiffs were able to infuse nearly all of the capital required by the Assistance Agreement by its entry date. On December 22, 1988, MSL purchased $35 million of subordinated debt issued by Bluebonnet. In addition, CFSB purchased $25 million in Bluebonnet common stock by obtaining a loan in that amount from Bankers Life and Casualty Company (Bankers Life), an insurance company affiliated with Robert T. Shaw.[21] The collateral for the Bankers Life Loan was Mr. Fail's common stock shares in Lifeshares and CFSB.[22] Mr. Fail infused this money into CFSB, which then purchased $25 million of Bluebonnet common stock. Plaintiffs, however, still needed to infuse an additional $10 million. On December 30, 1988, Mr. Fail and CFSB entered a loan agreement with Bankers Life, in which Bankers Life agreed to loan Mr. Fail $10 million to purchase Bluebonnet common stock.[23] On February 28, 1989, Bankers Life and Beta Financial Corporation (Beta Financial) entered into a "Loan Participation Agreement," which granted Beta Financial a $10 million participation interest in the Bankers Life loan. Bankers Life forwarded the funds to plaintiffs, and CFSB purchased $10 million of Bluebonnet common stock.

---

**17.** Pls.' Ex. 44, at 7. At the close of the transaction, CFSB owned 100% of the issued and outstanding common stock of Bluebonnet. Mr. Fail owned 100% of the issued and outstanding common stock of CFSB. CFSB subsequently purchased 96.7% of the issued and outstanding preferred stock of Bluebonnet, and Mr. Fail purchased the remaining 3.3%. CFSB and Mr. Fail continue to own the same percentages of common and preferred stock in the respective institutions. *See* Joint Stipulations, ¶ 62. Mr. Fail has served as Chairman of the Board of Directors of Bluebonnet and CFSB since their formation. Tr. at 770.

**18.** *See* Pls.' Ex. 44, at 10–12.

**19.** In *Bluebonnet Sav. Bank v. United States*, 43 Fed.Cl. 69, 72, 80 (1999), the court determined that the Assistance Agreement, the Capital Maintenance Agreement (CMA), the FHLBB Resolution, the December 21, 1988 letter from Mr. Fail to Mr. Root, and the December 22, 1988 letter form Mr. Carneal to Mr. Root, constituted a contract, which it referred to as the "Transaction Agreement." Therefore, when necessary, the court will refer to individual portions of the

contract by their respective names, and will refer to the contract as a whole as the "Transaction Agreement."

**20.** Pursuant to the CMA, Mr. Fail and CFSB agreed not to force Bluebonnet to declare a dividend that would cause its regulatory capital to fall below the negotiated levels or that exceeded 50% of its net retained earnings. Pls.' Ex. 44, at 8.

**21.** Bankers Life is the subsidiary of ICH Corporation, a publicly traded insurance company. Mr. Robert T. Shaw was the President and Chief Executive Officer of ICH in December 1988. Tr. at 1964. Bankers Life is the parent company of Marquette National Life Insurance Company. *Id.* at 1801.

**22.** Pls.' Ex. 68, Tab 1, at 3, ¶ 4.

**23.** *See* Def.'s Ex. 100; Pls.' Ex. 163. Throughout this opinion the court will refer to these two loans collectively as one loan from Bankers Life for $35 million.

Although the date is not clear in the record, after the parties entered the acquisition agreement, Bluebonnet submitted an application to treat subordinated debt as regulatory capital. On March 8, 1989, FHLBB issued Technical Amendment number 768, which approved Bluebonnet's application (subordinated debt forbearance).

Immediately following the acquisition, a new management team took over operation of Bluebonnet. One of management's first objectives was to consolidate the fifteen thrifts into a single institution, which initially held $2.8 billion in insured deposits and $1.8 billion in covered assets. To accomplish this goal, management took a series of steps to consolidate the fifteen thrifts, including auditing all the existing books from each institution, evaluating and documenting nearly 20,000 covered assets, creating new balance sheets and integrating 170 different computer systems. Approximately six months passed before management was able to operate the thrifts as a single institution.[24]

Mr. Fail spent a significant portion of 1989 searching for capital sources that either were willing to invest in Bluebonnet or to provide financing. Mr. Fail sent Mr. Kirchhofer and Mr. Carneal to meet with potential capital sources. Mr. Kirchhofer focused on finding what plaintiffs refer to as a "tax-advantaged partner." A tax-advantaged partner is an investor with substantial net earnings capable of utilizing the net operating losses generated by Bluebonnet. Between February and August 1989, Mr. Kirchhofer met with three potential tax-advantaged partners and two investment banking firms. For reasons which will be discussed, plaintiffs were unable to obtain financing.[25] Mr. Carneal, however, searched for investors willing to provide either equity or debt financing. In early 1989, Mr. Carneal met with several New York investment banking firms, but also was unable to obtain financing.[26] Mr.

Fail also utilized accounting firms, consultants and law firms to help search for the candidates willing to provide financing or to be a tax-advantaged partner.

On August 9, 1989, FIRREA was signed into law. FIRREA and its implementing regulations changed the capital requirements applicable to thrifts, imposing core capital, tangible capital, and risk-based capital requirements. The most important of these changes for Bluebonnet was the new core capital requirement, under which thrifts were required to maintain core capital equal to at least 3% of assets. 12 U.S.C. § 1464(t)(2)(A) (Supp. I 1989). FIRREA also altered the regulatory regime that currently existed, replacing FHLBB and FSLIC with a new agency, the Office of Thrift Supervision (OTS). FIRREA also created a thrift deposit insurance fund which the Federal Deposit Insurance Corporation (FDIC) would oversee.

On September 30, 1989, the end of the fiscal year, Bluebonnet's regulatory capital amounted to $99,157,000, which exceeded the capital requirements contained in the capital plan forbearance. A little over one-third of this regulatory capital was subordinated debt. Bluebonnet also generated over $29 million in net retained earnings, half of which could have been distributed on December 23, 1989, pursuant to the terms of the dividend forbearance.

FIRREA, together with OTS's implementing regulations, breached Bluebonnet's capital plan and subordinated debt forbearances, which "fundamentally altered the nature of the transaction ...." *Bluebonnet Sav. Bank,* 43 Fed.Cl. at 78, 80. FIRREA eliminated Bluebonnet's capital plan forbearance by implementing a higher core capital ratio. FIRREA also eliminated the subordinated debt forbearance because it prohibited Blue-

24. *See generally* Tr. at 2994–96, 3005–06, 3009, 3109.

25. Mr. Kirchhofer met with representatives from Cruikshank Associates, a consultant acting for a Canadian corporation, J.C. Penney, Sequa Corporation, Morgan Stanley & Co., Wasserstein,

Perella & Co., and G.E. Capital. *See id.* at 592–621.

26. Mr. Carneal met with Donaldson, Lufkin & Jenrette, Shearson Lehman Brothers, Merrill Lynch, Drexel Burnham Lambert, Goldman Sachs, and First Boston. He also met with Carl Icahn, a individual investor. *Id.* at 1326–32.

bonnet from treating subordinated debt as regulatory capital. Consequently, Bluebonnet's regulatory capital level decreased by $35 million, the amount of the subordinated debt note issued to MSL. In addition, the breach required Bluebonnet to alter its original capital structure to allow for the infusion of qualifying forms of capital. Together, the breach of the capital plan and subordinated debt forbearances caused Bluebonnet's core capital ratio to drop to 2.06% of assets, thus failing to comply with FIRREA's core capital requirement.

Concerned with a threat of seizure, the Board of Directors of Bluebonnet (Board of Directors) intensified its efforts to comply with FIRREA's capital standards. Neither Mr. Fail nor CFSB had sufficient funding to infuse capital into Bluebonnet. By letter dated December 7, 1989, Mr. Howard Neff, CEO of Bluebonnet, informed Mr. Robert Brick, Caseload Manager of OTS, of FIRREA's impact on Bluebonnet's existing capital structure, and requested that OTS approve one of three alternative financing proposals included within his letter. The first proposal involved Bluebonnet issuing $25 million of perpetual preferred noncumulative stock to be purchased by CFSB that would qualify as tangible and core capital. The second proposal sought to convert Bluebonnet's $35 million subordinated note into perpetual preferred stock to be purchased by CFSB, which would qualify as tangible and core capital. The third proposal attempted to convert $25 million of Bluebonnet's net retained earnings to common stock equity in lieu of the $25 million infusion from CFSB due on December 22, 1990.[27] OTS denied these requests.

OTS nevertheless approved a different plan submitted by the Board of Directors, which called for Bluebonnet to issue, and CFSB to purchase, $12.5 million of perpetual

preferred stock in place of the subordinated debt. On December 21, 1989, CFSB infused $25 million into Bluebonnet. The source of funding for the 1989 infusion came from Consolidated National Successor Corporation (CNC), a holding company owned in part by Mr. Shaw.[28] CNC loaned $25 million to Prime Financial, Inc. (Prime Financial), a company owned by Mr. Fail. Prime Financial subsequently purchased a $25 million subordinated debt note from CFSB, and CFSB infused $25 million into Bluebonnet. CNC also agreed to refinance the Bankers Life loan. In exchange, CNC obtained, among other things, a right to contingent interest amounting to 9% of the profits of CFSB, together with the right to acquire Bluebonnet, or, alternatively, 50% of the net proceeds of a potential sale of Bluebonnet.[29]

This infusion, however, was not enough to help Bluebonnet achieve capital compliance. Thus, Bluebonnet's management took additional steps to adequately capitalize the thrift. First, Bluebonnet shrank in size by selling approximately $150 million in assets. Second, Bluebonnet was forced to retain all of its net earnings to date ($35,221,000) for use as regulatory capital. Under the Dividend Forbearance, however, Bluebonnet would have been able to distribute 50% of its net retained earnings on December 23, 1989. The FIRREA-imposed capital levels altered Bluebonnet's right to declare dividends and breached that provision. *Id.* at 78, 80. Nevertheless, as a result of management's efforts, Bluebonnet was able to achieve capital compliance by December 31, 1989.

In the spring of 1990, the United States Senate Subcommittee on Antitrust, Monopolies and Business Rights held hearings on the restructuring of the savings and loan industry. The hearings included case studies on particular transactions, one of which focused

---

27. Pls.' Ex. 143, at B31493.

28. Consolidated National Successor Corporation was later renamed Consolidated National Corporation. For sake of clarity, the court will refer to both companies as CNC. CNC maintains voting control over ICH Corporation.

29. Specifically, CNC obtained a right to 30% of the net profits of Prime Financial. Prime Finan-

cial obtained a right to 30% of the net profits of CFSB. *See* Pls.' Ex. 156, Tabs 7–8. Mathematically, that equates to CNC obtaining a right to 9% of the net profits of CFSB. A related agreement included a provision in which CNC agreed to replace the subordinated debt purchased by MSL. *See* Pls.' Ex. 154, at 2. CNC, however, never replaced this subordinated debt. Tr. at 2030–31.

on the Bluebonnet transaction. The Bluebonnet hearings were held to "determine whether th[e] transaction was pursued with due regard for the benefits of fair and open competition." [30] Many senators believed FHLBB and FSLIC had been too generous in using taxpayer money to help fund the purchase of insolvent savings and loan institutions by private investors. Several senators questioned FHLBB and FSLIC officials at length, often criticizing them for approving a transaction that the senators believed amounted to a "sweetheart deal." In response to these hearings, OTS launched an internal investigation into the circumstances surrounding Mr. Fail's acquisition of Bluebonnet. *Bluebonnet Sav. Bank*, 891 F.Supp. at 335.

At approximately the same time, Mr. Fail and CFSB began searching for capital sources to fund the 1990 infusion. Plaintiffs conducted their search over a period of several months, in which Mr. Carneal and Mr. Kirchhofer individually met with several potential capital sources.[31] Although some of these investors expressed interest, none chose to finance the 1990 infusion.

Throughout May 1990, the Board of Directors sought to declare dividends. By letters dated May 2 and May 16, 1990, Mr. Howard Neff, Chief Executive Officer of Bluebonnet, informed Mr. Brick of the Board of Director's intent to declare preferred stock dividends. OTS denied these requests, reasoning that Bluebonnet was only marginally compliant with its capital requirements and that there was insufficient evidence to ascertain whether Bluebonnet would remain compliant. On September 12, 1990, Mr. Neff submitted to OTS a letter outlining a plan to finance the 1990 infusion. The plan sought approval to declare a common stock dividend of $25 million to CFSB, which CFSB would

then use to purchase $12.5 million in common stock and $12.5 million in subordinated debt.[32] OTS denied this request.

On October 30, 1990, the Board of Directors again sought regulatory approval to declare a dividend. In a letter sent to Mr. Fail dated November 6, 1990, Mr. Brick directed Bluebonnet not to pay any dividends until it provided FDIC with a "satisfactory commitment to infuse the remainder of the $120 million in capital and subordinated debt." [33] Three days later Mr. Billy Wood, District Director of OTS, notified Mr. Neff by letter that OTS officially objected to the Board of Director's notice to declare dividends, and informed Mr. Neff that Bluebonnet could not declare dividends until it adhered to the directive in Mr. Brick's letter.

By the end of November 1990, plaintiffs still were unable to find financing for the 1990 infusion, and thus could not provide FDIC with a satisfactory commitment as discussed in Mr. Brick's letter. Consequently, on November 28, 1990, Mr. Brick informed Mr. Neff that OTS now deemed Bluebonnet to be an institution requiring "more than normal supervision," pursuant to OTS Regulatory Bulletin 3a–1 (RB 3a–1).[34] This designation prohibited Bluebonnet from engaging in certain business activities, which included declaring dividends, without first receiving approval from OTS. OTS imposed these restrictions because it believed CFSB demonstrated financial instability by incurring a large amount of debt and feared this condition might have a deleterious impact upon Bluebonnet.[35]

With less than one month remaining before the 1990 infusion was due, and with approximately $80 million in outstanding debt to Bankers Life and CNC, plaintiffs returned to Mr. Shaw for help. On December 12, 1990, Mr. Fail and CFSB entered

---

**30.** "Impact of Restructuring of the S & L Industry: A Case Study on Bluebonnet Savings Bank—Part 2," Pls.' Ex. 182, at 1.

**31.** Mr. Carneal and Mr. Kirchhofer met with representatives from First Gibraltar Corporation, Sigma Corporation, Standard Morgan, Inc., World Savings, and Guardian Industries Corp. (Guardian). *See* Tr. at 628–37, 3683–85, 3694; Pls.' Exs. 94, 96–97, 100, 103.

**32.** Pls.' Ex. 190.

**33.** Pls.' Ex. 204.

**34.** RB 3a–1 is an OTS policy bulletin that concerns asset and liability growth of thrifts. *See* Tr. at 4111–12.

**35.** Pls.' Ex. 235.

separate loan agreements with Marquette National Life Insurance Company (Marquette), a company owned by Mr. Shaw, under which Marquette loaned CFSB $25 million for the final infusion and refinanced the 1988 and 1989 loans from Bankers Life and CNC.[36] On that same date, Mr. Fail entered the "Stock Acquisition Agreement" with Bluebonnet Interests, Inc. (BBI), another company owned by Mr. Shaw, which gave BBI the right to seek and obtain regulatory approval to purchase CFSB from Mr. Fail by December 11, 1992.[37] The loan agreement with Marquette included a provision that gave it the right to accelerate the due date on the loans to thirty days after it determined BBI would not acquire Bluebonnet.[38] Soon after BBI entered this agreement, Mr. Shaw undertook efforts to acquire Bluebonnet.

Following CFSB's infusion of the final $25 million, OTS took a series of actions against Bluebonnet. First, on December 26, 1990, Mr. Wood sent a letter to Mr. Fail which directed him to sign an attached document entitled "Supervisory Agreement" (SA). This document would have required, among other things, the immediate resignation of Mr. Fail and other members of the Board of Directors. In addition, the SA would have placed restrictions on Bluebonnet's business operations, including the declaration of common and preferred stock dividends.[39] Mr. Fail did not sign this document. Next, on March 19, 1991, OTS issued a supervisory directive, in which it ordered the Board of Directors "to act in the best interest of Bluebonnet in avoiding any detrimental effect CFSB Corporation may have on Bluebonnet."[40] This directive attempted to achieve the same goals as the SA, imposing constraints and restrictions on dividend declarations, mergers and consolidations and new professional service contracts.

By letter dated March 28, 1991, Mr. Wood informed Mr. Neff that OTS was changing Bluebonnet's classification from a Tier 1 to Tier 3 institution, particularly because of CFSB's current level of debt, lack of income, and ability to affect the financial stability of Bluebonnet. Pursuant to existing regulations, a Tier 3 association could not make capital distributions without receiving OTS' approval. *See* 12 C.F.R. § 563.134 (1991). In that same letter Mr. Wood relayed to Mr. Neff OTS's denial of Bluebonnet's pending dividend requests filed on February 25 and March 1, 1991. Mr. Wood cited Bluebonnet's failure to meet the proposed capital standards, as well as CFSB's financial condition, as reasons for its denials of the Board of Director's requests. The basis for this denial was the financial condition of CFSB and OTS's belief that a payment of dividends would prohibit Bluebonnet from meeting capital requirements OTS would soon implement.[41] Furthermore, OTS denied all of the Board of Director's requests in 1991 to declare common stock dividends, and approved only one request to declare a preferred stock dividend of $375,000.

During this time Bluebonnet encountered a number of disputes with FDIC concerning its rights under the Assistance Agreement. On June 5, 1991, plaintiffs filed suit against the FDIC in the District Court for the Northern District of Texas, seeking a declaratory judgment as to the proper application of the Assistance Agreement. Plaintiffs also requested damages and other relief, claiming that "FDIC failed to furnish material consideration required by the contract." *Id.*

In September 1992, Mr. Shaw abandoned his efforts to acquire Bluebonnet. Plaintiffs thus began negotiations with him concerning the repayment of their outstanding loans, which amounted to approximately $140 million and were due on December 31, 1992.[42] Mr. Shaw and Mr. Fail eventually reached a

---

36. *See* Pls.' Ex. 210, Tab 3.

37. Pls.' Ex. 214, at 9.

38. Pls.' Ex. 210, Tab 2, at § 2.07.

39. *See* Pls.' Ex. 221.

40. Def.'s Ex. 771.

41. *See* Pls.' Ex. 235. OTS contemplated issuing new capital requirements similar to those applicable to national banks, which at the time was 3% plus a capital cushion of approximately 100 to 200 basis points. *Id.*

42. *See* Tr. at 2001.

verbal agreement, which they memorialized in an exchange of letters dated October 7, 1992. Mr. Shaw, through CNC, agreed that upon Mr. Fail and CFSB's reduction of their existing debt to $81 million, CNC would execute long-term loans of not more than that amount to them. In exchange, Mr. Fail agreed to give CNC a 50% economic interest in CFSB.[43]

At the time of the letter exchange, however, Mr. Fail and CFSB did not have sufficient funds to reduce their debt. Consequently, on November 24, 1992, plaintiffs sought an injunction in the District Court for the Northern District of Texas to force OTS to permit, among other things, Bluebonnet to distribute common stock dividends. On December 1, 1992, OTS rated Bluebonnet as a Tier 1 institution and directed the Board of Directors to pass a resolution affirming its intent to maintain Bluebonnet's current regulatory capital level.[44] OTS also approved outstanding requests to declare dividends, but required that the funds be used solely to pay down acquisition debt held by Mr. Fail and CFSB.[45]

On January 25, 1993, Mr. Fail, CFSB, and CNC executed the "Economic Benefits Agreement," (EBA) which further detailed the agreement discussed by Mr. Fail and Mr. Shaw in their October 7, 1992 letters.[46] Pursuant to the agreement, CNC reduced the amount of debt held by Mr. Fail and CFSB and provided long-term financing for that debt, in exchange for Mr. Fail essentially giving CNC a 49% interest in the future profits of CFSB.[47] CNC also obtained the right to receive a percentage of the proceeds from a sale of Bluebonnet.

On June 25, 1993, FDIC filed a counterclaim against plaintiffs in the district court

litigation, seeking recission of the Transaction Agreement on the ground of fraud in the inducement. Specifically, FDIC claimed that Mr. Fail did not disclose to FHLBB and FSLIC before entering the transaction information concerning his prior indictment and his entering a plea bargain on behalf of one of his companies. *Id.* at 336. In an opinion issued on June 28, 1995, the court granted plaintiffs' motion for summary judgment on FDIC's counterclaim, finding it to be "without merit, and pushing the envelope of Rule 11." *Id.* at 341. On August 2, 1995, the parties entered a settlement agreement in which they were able to resolve a number of issues raised in litigation and to agree upon a mutual release of a number of plaintiffs' claims. In addition, the parties agreed to except from the mutual release and dismiss without prejudice plaintiffs' claims that defendant breached the capital plan, subordinated debt, and dividend forbearances, or that defendant committed a taking of these rights under the Fifth Amendment of the Constitution.

On August 8, 1995, plaintiffs filed a complaint in this court, claiming that the passage of FIRREA breached the capital plan, subordinated debt, and dividend forbearances, which caused them damage. Plaintiffs alternatively claimed that the passage of FIRREA resulted in an uncompensated taking under the Fifth Amendment. In an opinion dated March 2, 1999, the court determined that the passage of the FIRREA and its implementing regulations breached the capital plan, subordinated debt and dividend forbearances. *Bluebonnet Sav. Bank,* 43 Fed. Cl. at 78, 80. Beginning June 21, 1999, the court held approximately six weeks of trial on the issue of damages.[48] Due to the una-

---

**43.** Pls.' Ex. 261.

**44.** Pls.' Ex. 265.

**45.** Pls.' Ex. 266.

**46.** This agreement was amended on January 31, 1995, and renamed the "Amended and Restated Economic Benefits Agreement" (AREBA). Pls.' Ex. 275. The AREBA was further amended on December 1, 1997, and renamed the "Second Amended and Restated Economic Benefits Agreement" (SAREBA). Pls.' Ex. 286. The purpose for these amendments was to incorporate

changes in the holding company structure of Bluebonnet and to further some of Mr. Fail's estate planning objectives. Tr. at 2158–60.

**47.** CNC reduced this amount from 50% to 49% to address concerns that regulators might view it as obtaining control of CFSB. *Id.* at 1850. Companies affiliated with CNC refinanced Mr. Fail's and CFSB's loans. *See* Pls.' Ex. 269.

**48.** During proceedings defendant filed a motion under RCFC 52(c), seeking judgment on partial findings of fact. The court denied this motion. Tr. at 5154–55.

vailability of one of defendant's expert witnesses, the proceedings did not recommence until November 1, 1999. The court held closing arguments on December 16, 1999.

*Discussion*

I. Summary of plaintiffs' damage claim.

Plaintiffs seek expectancy damages in the amount of $175,882,000.[49] Plaintiffs aver that they have met the standard for awarding expectancy damages, asserting: (1) their damages were reasonably foreseeable at the time the parties entered the contract; (2) the breach was a substantial factor in causing their damages; and (3) they have proven their damages with reasonable certainty. Plaintiffs assert that at the time the contract was entered defendant knew or should have known that Mr. Fail and CFSB lacked adequate capital to acquire Bluebonnet and intended to rely upon dividends distributed from Bluebonnet to CFSB to help finance the cost of the acquisition through various alternative financing methods. Plaintiffs aver that defendant's breach of the three forbearances destroyed their original financing plan and caused the financing of the Bluebonnet acquisition to become riskier, more difficult to obtain, and ultimately more expensive for Mr. Fail and CFSB. Plaintiffs' damages consist of additional interest on indebtedness, higher fees paid to lenders, and the cost of the EBA and its successor agreements.

Conversely, defendant claims that plaintiffs failed to meet their burden of proving their alleged damages. Specifically, defendant asserts that it was unforeseeable at the time the contract was entered that a breach of the three forbearances would cause plaintiffs to incur increased financing costs. Defendant posits that plaintiffs offered no evidence to establish the breaches caused their damages, and maintains that plaintiffs failed to refute non-breach factors would have shaped the financing arrangement despite the enactment of FIRREA. Defendant also contends that plaintiffs failed to prove their damages with reasonable certainty.

A party's expectation interest is the "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981). Expectancy damages are recoverable provided "they are either actually foreseen or reasonably foreseeable, are caused by the breach of the promisor and are proved with reasonable certainty." *Glendale Fed. Bank v. United States,* 43 Fed.Cl. 390, 398 (1999) (discussing *Wells Fargo Bank, v. United States,* 88 F.3d 1012 (Fed.Cir.1996) (*Wells Fargo* )). Plaintiffs must satisfy each of these tests in order to prevail. Accordingly, the court must determine whether plaintiffs' damage claim satisfies these three tests.

II. Foreseeability

A. Breach of the Dividend Forbearance

Plaintiffs contend that their damages were foreseeable at the time the parties entered the contract. Plaintiffs assert that the terms of the contract best demonstrate the foreseeable importance of the three forbearances. In addition, plaintiffs contend that FHLBB and FSLIC knew that Mr. Fail and CFSB would borrow acquisition funds because they did not have sufficient capital to cover the cost of acquiring Bluebonnet. Plaintiffs posit that FHLBB and FSLIC should have known that CFSB and Mr. Fail would need dividends distributed from Bluebonnet to CFSB either to obtain financing from commercial lenders or to attract a tax-advantaged partner to put forth capital for the acquisition. Plaintiffs aver that defendant should have known that in order to repay their debt, Mr. Fail and CFSB would need cash, in the form of dividends, to service their acquisition loans.

Defendant counters that plaintiffs' alleged damages were unforeseeable at the time the parties entered the contract. Defendant argues that plaintiffs agreed in the Fail and Carneal letters not to rely upon dividends distributed by Bluebonnet to help fund its acquisition by CFSB. Additionally, defen-

---

**49.** CFSB claims damages in the amount of $24,402,000, while Mr. Fail seeks $151,480,000. Plaintiffs' damages, however, are limited by set-

tlement agreement to $136,075,000. Bluebonnet's recovery is limited to one dollar.

dant asserts that FHLBB and FSLIC did not know that plaintiffs intended to rely upon dividends to help finance the Bluebonnet acquisition. Defendant further points to the CASD memorandum, the minutes of the FHLBB meeting, and the FHLBB resolution as proof that it did not know plaintiffs would rely upon dividends.

■ It is well-established that the breaching party will be liable only for damages that were foreseeable at the time the parties enter the contract. *See Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 524 F.2d 707, 714 (1975); *Estate of Berg v. United States*, 231 Ct.Cl. 466, 687 F.2d 377, 382 (1982). In other words, foreseeability is based upon what the parties contemplated at the time of contract formation. *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 (Fed.Cir.1986); *Wm. T. Thompson Co. v. United States*, 26 Cl.Ct. 17, 27 (1992), *aff'd sub. nom. Hercules Inc. v. United States*, 24 F.3d 188 (Fed.Cir.1994), *aff'd*, 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). The test of foreseeability is an objective one. *Salsbury Ind. v. United States*, 17 Cl.Ct. 47, 58 (1989), *aff'd*, 905 F.2d 1518 (Fed.Cir.1990); RESTATEMENT (SECOND) OF CONTRACTS § 351 cmt. a (1981). A plaintiff may establish foreseeability by either demonstrating that the damages were actually foreseen or reasonably foreseeable by defendant at the time of contract formation. *Glendale Fed. Bank*, 43 Fed.Cl. at 398; *Cal. Fed. Bank v. United States*, 43 Fed.Cl. 445, 451 (1999).

The court must decide whether it was reasonably foreseeable at the time the parties entered the contract that a breach of the dividend forbearance would cause plaintiffs to incur increased costs to support debt financing of the acquisition. That determination, however, first requires the court to ascertain whether it was reasonably foreseeable that plaintiffs would rely upon dividends to help finance the Bluebonnet acquisition. The court begins its analysis by examining the dividend forbearance and the Fail and Carneal letters, primarily because these documents relate to the distribution of dividends and/or plaintiffs' plans to finance the acquisition.

■ The court must construe the contract by its plain and unambiguous language. *Summerfield Housing Ltd. Partnership v. United States*, 42 Fed.Cl. 160, 166 (1998), *aff'd*, 217 F.3d 860, 1999 WL 1111478 (Fed.Cir.1999)(Table), *cert. denied*, —— U.S. ——, 120 S.Ct. 2691, 147 L.Ed.2d 963 (2000). In interpreting a contract, the court seeks to "effectuate its spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991) (citing *Arizona v. United States*, 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978)). A court must give reasonable meaning to all parts of the contract "so as to harmonize and give meaning to all its provisions", and not render portions of the contract meaningless. *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 591 F.2d 629, 633 (1979); *see also Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985). Furthermore, "an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona*, 575 F.2d at 863.

■ The dividend forbearance provides:

Beginning one year following the Effective Date, Consolidated FSB shall be permitted to pay cash dividends in an amount up to 50% of net income for a fiscal year, provided that its level of regulatory capital is in compliance with the Capital Plan, as outlined in the preceding paragraph, to the extent that such payment would not cause regulatory capital to fall below the level specified in the Capital Plan.[50]

The dividend forbearance was "designed to ensure that Mr. Fail and CFSB could receive dividends notwithstanding the capital problems of the new institution." *Bluebonnet Sav. Bank*, 43 Fed.Cl. at 73. "Indeed, the only plausible way to understand the provision is as a cash flow guaranty (provided, of course, other conditions are met) to CFSB and Mr. Fail." *Id.*

---

50. Pls.' Ex. 45, at 2.

It is clear that the plain language of the dividend forbearance placed no restrictions on Mr. Fail's and CFSB's use of common stock dividends after distribution by Bluebonnet to CFSB. Regulations in effect at that time permitted regulators to approve applications whereby the holding company would service debt with dividends so long as the company was limited to receiving no more than 50% of the thrift's net income per year as dividends. *See* 12 C.F.R. § 574.8(a)(1)(iii)(A) (1989) (effective November 28, 1988, as stated in 53 Fed.Reg. 47941, 47942 (1988)). Mr. M. Danny Wall, former Chairman of FHLBB, admitted on cross-examination that he was aware of this regulation when he voted to approve the acquisition.[51] In addition, Mr. Eric Berg, an attorney with CASD at the time of the acquisition, conceded on cross-examination that FHLBB had the authority to restrict how CFSB used dividends once they were distributed by Bluebonnet.[52] FHLBB, however, never restricted CFSB's use of dividends. Therefore, the court can infer that defendant should have known that plaintiffs could use dividends to help finance the acquisition under the contract. The court agrees that the purpose of the dividend forbearance was "to ensure a source of cash flow for CFSB and Mr. Fail in order to cover the costs of financing the transaction going forward." *Id.* at 78.

Defendant, however, claims that plaintiffs agreed in the Fail and Carneal letters not to rely upon dividends to help finance the Bluebonnet acquisition. First, defendant maintains that Mr. Fail's reference to the term "my own resources" excluded his ownership of CFSB stock. Second, defendant avers that plaintiffs' agreement not to distribute dividends until finding a source of funding for the 1990 infusion implies plaintiffs would not rely upon dividends.

The Fail letter, which discussed in detail plaintiffs' plan to fund $120 million infusion, provides, in pertinent part:

I understand your legitimate interest in the form of capital infusion, and that you are determined (as am I) to not unduly burden the resulting thrift .... My specific commitment in this letter is to *fund out of my own resources $107.5 million (3.4% of liabilities) of that total.* Under our business plan, we will fund the remaining $12.5 million through a tax[-] advantaged partner.[53]

Mr. Fail also discussed alternatives for funding the 1989 and 1990 common stock infusions:

Farm and Home Life Insurance Company, a wholly-owned subsidiary of Lifeshares, would commit to a loan of $12.5 million to satisfy at least one tranche. Another alternative would be for me to pledge certain portions of my stock in the thrift holding company. Such a structure would merely create a contingent interest in my stock in the holding company rather than a debt service burden on the thrift.[54]

The Carneal letter addressed the distribution of dividends, stating:

The purpose of this letter is to confirm my telephone conversation with your associate, Rob Roe, regarding the capital infusion to be made by the investors in this package. As discussed with Mr. Roe, the investors agree that the resulting thrift will make no distribution of dividends until such time as a commitment with regard to the remaining $12.5 million capital infusion (as described in the letter from James Fail to you of this date) is secured and submitted to the satisfaction of FSLIC.[55]

The purpose of the Fail and Carneal letters was to respond to the FHLBB resolution. This resolution required plaintiffs to "provide satisfactory evidence to the OGC and the Office of Regulatory Activities as to the source of funds to be used for [CFSB's] $50,000,000 of subsequent capital contributions to [Bluebonnet]."[56] Mr. Wall testified that the letters satisfied that condition.

51. Tr. at 3403–04.

52. *Id.* at 3509–10.

53. Pls.' Ex. 39 (emphasis in original).

54. *Id.*

55. Pls.' Ex. 40.

56. Pls.' Ex. 46, at 10.

The court finds that plaintiffs did not agree in the Fail and Carneal letters to forgo reliance upon dividends for financing purposes. Neither letter contains an express agreement not to rely upon dividends. Although the Fail letter does not define the term "my own resources," it is undisputed that at the time the parties entered the contract Mr. Fail purchased 100% of the outstanding common stock of CFSB. Thus, Mr. Fail's ownership of CFSB stock, which included the right to receive common stock dividends distributed by Bluebonnet to CFSB, was one of his "own resources." [57]

Moreover, although plaintiffs agreed in the Carneal letter not to distribute dividends until having provided FSLIC with satisfactory evidence of a source of financing for the 1990 equity infusion, that did not prohibit plaintiffs from seeking financing based upon a future expectation of dividend distributions. Bankers Life agreed to loan Mr. Fail $35 million with knowledge that Bluebonnet could not distribute dividends until December 23, 1989. Mr. Robert Beisenherz, a consulting actuary for the firm Lewis and Ellis in 1988 who was involved in the loan negotiations process, explained that there was an anticipation that there would be distributable earnings from Bluebonnet.[58] Additionally, Mr. Root stated that if a borrower could demonstrate to a lender that dividends ultimately would be available from the borrower's subsidiary, dividends would not need to be distributed immediately to attract financing. Based upon this testimony, the court finds that the language of the letter does not foreclose the possibility of obtaining a source for the 1989 and 1990 infusions without actually distributing dividends before the infusions became due.

In reading the contract as a whole, the court finds the contract did not prohibit plaintiffs from using dividends for financing the acquisition. In fact, Mr. Wall conceded on cross-examination that a thrift owner could use "income derived appropriately from a financial institution" to service his debt.[59] Mr. Root testified for plaintiffs that there was nothing wrong with Mr. Fail using dividends to help capitalize the acquisition of Bluebonnet.[60] The court finds this testimony persuasive and convincing.

Additionally, the court finds that evidence presented at trial also establishes that defendant should have known that plaintiffs would seek to rely upon dividends to help finance the Bluebonnet acquisition. Defendant knew that the dividend forbearance was an important component of the contract to plaintiffs. Mr. Carneal testified that he and Mr. Roe discussed the dividend forbearance, in which he told Mr. Roe that exclusion of the dividend forbearance from Assistance Agreement would be a "deal killer."[61] Mr. Carneal testified that he and Mr. Roe discussed plaintiffs' *pro forma* projections, which were included within their business plan, and told him that based upon these projections plaintiffs expected to receive dividends at the maximum 50% rate within its first year of operations.

At the time the parties entered the Assistance Agreement, FHLBB knew that Mr. Fail and CFSB did not have sufficient funds to cover the entire $120 million acquisition. For example, Mr. Wall testified on cross-examination that prior to closing he knew that the $120 million capital investment exceeded Mr. Fail's net worth.[62] Mr. Fail testified that he informed FHLBB that his net

---

57. Defendant also claims that Mr. Fail agreed not to place a "debt service burden" upon Bluebonnet, and the use of dividends for financing purposes would create such a burden. The only debt service burden placed upon the Bluebonnet, however, was the repayment of subordinated debt purchased by MSL. Loans to be undertaken by Mr. Fail or CFSB that utilized CFSB stock as collateral would place the obligation of repayment upon Mr. Fail or CFSB, not Bluebonnet. *See* Tr. at 3252–53, 3404.

58. ICH Corporation was a client of Lewis and Ellis. Mr. Beisenherz worked on several transactions with ICH, and eventually was hired by it. *Id.* at 1799, 1802.

59. *Id.* at 3404.

60. *Id.* at 1446.

61. *Id.* at 1280.

62. *Id.* at 3360.

worth was approximately $30—$40 million.[63] This testimony was corroborated by a memorandum drafted by Neal Moran, a financial analyst for the Federal Home Loan Bank of New York, which stated that "[t]he capital investment exceeds Mr. Fail's net worth. He reports [a] net worth of $40 million." [64] Defendant also knew that CFSB was formed solely to acquire Bluebonnet, and its assets would consist of its common stock ownership in Bluebonnet and any other assets Mr. Fail would infuse.

FHLBB further knew that Mr. Fail was borrowing money to finance the $35 million common stock infusion due on December 22, 1988. In a letter sent to Mr. Berg dated December 21, 1988, Mr. Carneal stated that Mr. Fail would borrow $35 million from ICH corporation, or one of its affiliates, to purchase the initial installment of Bluebonnet common stock.[65] The letter informed Mr. Berg that the loan would be collateralized by Mr. Fail's common stock holding in Lifeshares. Additionally, the CASD Memo acknowledged that the loan would come from Bankers Life and that Mr. Fail would pledge his common stock in Lifeshares as collateral. Mr. Carneal provided to Mr. Roe via facsimile a copy of the commitment letter from Bankers Life concerning the $35 million loan on December 22, 1988.[66] Significantly, the commitment letter stated that collateral for the loan would include a security interest in 100% of the common stock of Lifeshares, 100% of the common stock of Bluebonnet, and other collateral that Bankers Life chose.[67]

Mr. Beisenherz testified that Bankers Life sought additional collateral beyond Lifeshares stock because Lifeshares had a net worth of approximately $20 million at the time, and he never anticipated that Lifeshares could fully service debt from the loan.[68] FHLBB had access to Lifeshares' financial statements[69] and thus should have known that the value of Lifeshares common stock could not completely support the 1988 loan. Mr. Beisenherz testified that Bankers Life looked to Bluebonnet common stock (which later was substituted with CFSB stock) as a source of collateral because it offered income to service debt and held Bankers Life's money.[70] The fact that Bankers Life required CFSB stock as collateral above and beyond Mr. Fail's pledge of his Lifeshares common stock demonstrates that neither this stock nor his personal wealth could cover the $35 million loan.

Additionally, the Fail letter informed FHLBB that plaintiffs might fund the 1989 and 1990 infusions by obtaining loans collateralized by CFSB common stock.[71] Mr.

63. *Id.* at 789.

64. Def.'s Ex. 660, at 1.

65. Pls.'s Ex. 42.

66. Pls.' Ex. 318; Tr. at 1286–87. Defendant chose not to call Mr. Roe to testify to his version of the negotiations and his discussions with Mr. Carneal. Plaintiffs request that the court infer that Mr. Roe's testimony would have been unfavorable to defendant. While the court is unwilling to make this inference, it nevertheless finds the circumstances surrounding defendant's counsel's decision not to call Mr. Roe to testify somewhat questionable.

67. Pls.' Ex. 64.

68. Tr. at 1813.

69. *Id.* at 3242. Defendant, however, argues that it believed the common stock infusions would be funded by Mr. Fail's insurance companies. The record proves otherwise. First, Mr. Wall testified that at the time the parties entered the contract, he understood that Lifeshares would not be responsible for funding the common stock infusions. *Id.* at 3361. Second, the evidence demonstrates that Mr. Fail's insurance companies could not provide funding for the common stock infusions. The Office of General Counsel within FHLBB informed Mr. Fail's attorney that it would not declare Lifeshares (or its affiliates) a thrift holding company provided Lifeshares' (or its affiliates') participation was limited to purchasing non-voting subordinated debt. Additionally, this position was based upon the understanding that Lifeshares would not loan Mr. Fail money to purchase common stock, and should circumstances change, FHLBB's "no action" conclusion might also change. Pls.' Ex. 310.

70. Tr. at 1812.

71. Mr. Root testified that it was acceptable for Mr. Fail to pledge CFSB stock as collateral for financing the Bluebonnet acquisition. *Id.* at 1442–43. Additionally, Mr. Wall conceded on cross-examination that he did not perceive a problem with Mr. Fail pledging his stock in CFSB as loan collateral. *Id.* at 3368.

Root testified that if Bluebonnet generated earnings, the dividend forbearance would demonstrate that Mr. Fail and CFSB were good credit risks and would assist in attracting financing.[72] Therefore, based upon all of the evidence discussed, the court finds that it was foreseeable that Mr. Fail would need to rely upon dividends not only to repay the 1988 loan, but also to help obtain financing for the 1989 and 1990 common stock infusions. Consequently, the court finds it was foreseeable under the circumstances that Mr. Fail and CFSB would incur the increased financing costs they now claim without dividends to assist in obtaining additional loans and repaying existing debt.

Defendant, however, argues that plaintiffs' damages allegedly incurred from refinancing the 1988 Bankers Life loan were not foreseeable because plaintiffs told defendant they would obtain a long-term loan and not a three-month bridge loan. The court finds defendant's argument unpersuasive. An attachment to Mr. Carneal's December 21, 1988 letter to Mr. Berg stated that the proposed loan would be long-term, but the details of the loan were still being negotiated. This language does not foreclose the possibility of a short-term loan. Moreover, Mr. Roe received the loan commitment letter from Mr. Carneal, which states that the term of the loan was being negotiated. Accordingly, the court holds that defendant should have foreseen the possibility that the loan could be short-term.[73]

B. Breach of capital plan and subordinated debt forbearances.

■ Plaintiffs claim that the capital plan and subordinated debt forbearances were critical to their financing plans. Plaintiffs contend that it was an economic advantage for Mr. Fail and CFSB to provide one-half of the $120 million infusion in the form of subordinated debt notes issued by Bluebonnet

and purchased by third parties. Plaintiffs assert that it was foreseeable that a breach of the subordinated debt forbearance would cause Mr. Fail and CFSB to borrow more money, and in different forms, than originally planned, thus increasing their cost of financing.

Conversely, defendant asserts that it was not foreseeable that a breach of the capital plan and subordinated debt forbearances would cause plaintiffs to incur increased financing costs. Defendant claims that plaintiffs would have been required to infuse $120 million into Bluebonnet even if defendant had not raised the minimum regulatory capital requirement and eliminated the use of subordinated debt as regulatory capital.

Defendant knew that MSL purchased a $35 million subordinated debt note from Bluebonnet the date the parties entered the contract. Defendant also knew that Lifeshares would purchase subordinated debt or place it with unaffiliated third parties. Subordinated debt was a direct borrowing by Bluebonnet, not Mr. Fail or CFSB, and thus Bluebonnet was responsible for its repayment. Clearly, the subordinated debt forbearance reduced the amount of acquisition funds Mr. Fail and CFSB would need to raise. Based upon these facts, the court finds that a foreseeable consequence of the breach of the subordinated debt forbearance would be a drop in Bluebonnet's regulatory capital level by $35 million. FHLBB could foresee that the elimination of subordinated debt as regulatory capital would cause Mr. Fail and CFSB to borrow more capital than they would have absent the breach.

After its initial capitalization, Bluebonnet's regulatory capital level was compliant with the 1.75% capital requirement contained within the capital plan forbearance. Defendant projected that Bluebonnet would be viable over a five year period. These projections included a net income of $5.3 million

---

72. *Id.* at 1444–45.

73. Defendant also claims that it was not foreseeable that Mr. Fail would be damaged by the conveyance of a 49% interest in CFSB when his association with a tax-advantaged partner would require him to relinquish an 80% interest in CFSB. The court finds this argument unpersua-

sive. Plaintiffs' business plan described the possible implementation of a two-tier holding company in order to facilitate the entry of a tax-advantaged partner into Bluebonnet. Contrary to defendant's position, the business plan did not discuss the sale of equity to a tax-advantaged partner. *See* Pls.' Ex. 32, at F101869–871.

after one year of operation.[74] The court finds that FHLBB could foresee that a breach of the capital plan forbearance would have caused Bluebonnet to fall out of capital compliance. Clearly, Bluebonnet would need to raise its core capital level, either by shrinking or infusing more capital. It was foreseeable that these breaches, together with the breach of the dividend forbearance, would cause Bluebonnet to retain dividends otherwise distributable under the dividend forbearance. Consequently, plaintiffs would be unable to use these dividends for financing purposes, and thus could incur higher financing costs. Accordingly, the court finds it was objectively foreseeable at the time the parties entered the contract that a breach of the capital plan and subordinated debt forbearances would cause plaintiffs to incur increased financing costs.

### III. Causation

It is well-established that damages in an action for a breach of contract are generally limited to the "natural and probable consequences of the breach complained of . . ." *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353, 357 (1951). Stated more particularly, " 'the cause must produce the effect inevitably and naturally, not possibly nor even probably.' " *Id.* (quoting *Myerle v. United States,* 33 Ct.Cl. 1 (1897)). Plaintiffs must prove defendant's breach was a substantial factor in causing their damages. *Cal. Fed. Bank,* 43 Fed.Cl. at 451; Arthur L. Corbin, 5 CORBIN ON CONTRACTS § 999, at 25 (1964); *accord LaSalle Talman Bank v. United States,* 45 Fed.Cl. 64, 97 (1999) (finding "sufficient evidence to establish that FIRREA was at least a substantial factor in plaintiff's increased costs").[75]

Plaintiffs claim that defendant's breach of the three forbearances was a substantial factor in causing them to incur increased financing costs for the Bluebonnet acquisition. Plaintiffs aver that the three breaches destroyed the original capital structure of Bluebonnet and their financing plan. Plaintiffs assert that the breaches increased the riskiness of CFSB stock as collateral for a loan and prevented them from obtaining financing in the traditional capital markets. Plaintiffs allege that this increase in credit risk increased their cost of raising capital from Mr. Shaw in 1989, 1990 and 1992. Plaintiffs also posit that factors unrelated to the breach did not cause their damages.

Defendant argues that plaintiffs failed to prove that but-for the breach they would not have been damaged.[76] Defendant asserts that plaintiffs' damage claim fails because no potential investors with whom they met testified that the breaches dissuaded them from investing in Bluebonnet. Defendant maintains that the breaches did not make Bluebonnet or CFSB riskier and contends that plaintiffs could have raised capital despite the breaches. Defendant also contends that plaintiffs failed to prove that non-breach factors would have caused them to enter the same financing terms absent the breach.

In support of their claim, plaintiffs provided expert testimony from James G. Valeo, owner of Montana Mortgage Company. Mr. Valeo spent the majority of his career as an investment banker and financial consultant, which included assisting savings and loan institutions raise capital in the 1980's and early 1990's. Mr. Valeo was admitted as an expert in investment banking.[77]

Mr. Valeo expressed an opinion concerning the effect the breaches had upon plaintiffs and their attempts to procure financing. Mr.

---

74. *See* Pls.' Ex. 38, at F400365.

75. The court notes that generally the law of this circuit requires plaintiffs to prove that the breach was the proximate cause of their injury. *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 526 (1960). In other words, plaintiffs' damages must be solely attributable to the breach. *See J.D. Hedin Constr. Co. v. United States,* 197 Ct.Cl. 782, 456 F.2d 1315, 1330 (1972). The court, however, has applied the substantial factor test in *Winstar*-related cases.

76. Specifically, defendant claims that plaintiffs failed to prove that absent the breach they could have achieved the terms of the "but-for" world included in their damage model. *See* Def.'s Br. at 30. The court will address this argument in the Part IV of this opinion.

77. *See* Tr. at 2653–58, 2661.

Valeo testified that FIRREA caused a great deal of uncertainty in the capital markets which significantly reduced interest in thrift equity and debt securities.[78] In discussing the dividend forbearance, Mr. Valeo opined that "the primary focus of an institutional investor in a debt instrument is cash flow," and the ability to service debt.[79] Mr. Valeo asserted that the breaches, by prohibiting the distribution of common stock dividends by Bluebonnet, made CFSB a riskier investment to potential investors. Mr. Valeo testified that potential investors would not invest in CFSB because it was dependent upon Bluebonnet for income, it lacked sufficient income to service debt undertaken, and there was no certainty that defendant would ever permit Bluebonnet to distribute common stock dividends. Mr. Valeo opined that although plaintiffs' capital raising efforts were thorough and comprehensive, CFSB's increased credit risk, together with the deteriorating capital markets, caused plaintiffs' failure to raise capital. According to Mr. Valeo, Mr. Fail's and CFSB's financing costs increased because they could not obtain financing from anyone besides Mr. Shaw and his affiliated companies.[80]

Plaintiffs also offered the expert testimony of Mr. E. Gareth Plank, a retired securities analyst and employee of Lehman Brothers at the time of the breach.[81] Mr. Plank was admitted over objection as an expert on the effect of the breaches upon Bluebonnet. Mr. Plank testified that FIRREA created a wave of uncertainty which caused a drop in issuances of common and preferred stock by thrifts. Mr. Plank conceded that some companies with good prospects, such as income and asset protection, were able to raise capital. He opined, however, that the breaches

destroyed Mr. Fail's opportunity to raise capital, particularly because CFSB lacked cash flow from Bluebonnet. Mr. Plank testified that plaintiffs had no other option but to seek financing from Mr. Shaw, and consequently paid higher financing costs.[82]

Plaintiffs also provided the expert testimony of Professor Roman Weil to address the issue of risk and plaintiffs' financing costs. Professor Weil is a certified public accountant and certified management accountant. He teaches accounting and economics at the University of Chicago Graduate School of Business.[83] Professor Weil testified that defendant's breaches increased the risk and uncertainty that surrounded Bluebonnet and CFSB, which increased plaintiffs' financing costs. He opined that the prohibition of common stock dividend declarations to CFSB caused plaintiffs' acquisition lenders to charge more to lend capital to Mr. Fail and CFSB.[84]

At trial, defendant produced two experts to rebut plaintiffs' experts' testimony regarding credit risk and plaintiffs' inability to obtain financing in the capital markets. Defendant provided expert testimony from Professor Merton Miller, economist and joint recipient of the Nobel Memorial Prize in Economic Science in 1990. Professor Miller was admitted as an expert in the area of financial economics, financial institutions, and corporate finance, including the areas of leverage, capital structure, dividend policy, cost of capital, valuation and corporate investment decisions.[85] The court admitted Professor Miller as an expert over plaintiffs' objection.

Professor Miller expressed the opinion that the breaches did not increase CFSB's credit risk or its cost of raising capital. In

---

**78.** In fact, Mr. Valeo testified that he believed that President Bush's statements in February 1989, concerning the administration's plan to resolve the growing thrift crisis, created enormous uncertainty in the capital markets which caused the markets to lose interest in thrift issued securities. *Id.* at 2678–79.

**79.** *Id.* at 2685.

**80.** *See id.* at 2685–86, 2690, 2707–08. In rendering his opinion, Mr. Valeo relied in part upon the affidavits of Mr. Carneal and Mr. Kirchhofer.

**81.** *Id.* at 2857–58. Mr. Plank received recognition in three consecutive years in a Wall Street Journal poll for his successful endeavors as a securities analyst. *Id.* at 2860.

**82.** *See id.* at 2881, 2885–86, 2899.

**83.** *Id.* at 160.

**84.** *Id.* at 206–07.

**85.** It is with great regret that the court notes that Professor Miller passed away on June 3, 2000.

discussing the dividend forbearance, Professor Miller testified that an assurance of cash flow from Bluebonnet to CFSB would not make CFSB a better credit risk because Bluebonnet still held its earnings and eventually would be able to distribute them. With respect to dividend distributions, Professor Miller discussed the "dividend irrelevance proposition," one of the Miller and Modigliani (M & M) propositions:

All a dividend policy does is determine whether the shareholders get their money in cash or in the form of increase in the value of the shares. It's the question of—as I often say—taking money out of one pocket and putting it in the other. It doesn't determine the total value.[86]

Professor Miller testified that a company's ability to raise capital depends upon its future prospects and not its current cash flow. He opined that the breach of the dividend forbearance did not have any effect upon the future prospects of Bluebonnet, and he did not think investors would ever be concerned with a restriction upon dividend payments. He expressed the opinion that CFSB did not need dividends to obtain financing; rather, it could have raised capital by issuing securities or by using deferred interest debt instruments, such as payment-in-kind notes (PIKs).[87]

Defendant also provided the expert testimony of Dr. Kenneth Cone, an employee of Lexecon, an economics consulting firm. Dr. Cone was admitted as an expert in financial economics. Dr. Cone opined that following FIRREA, thrifts and thrift holding companies could raise money for any purpose. He testified that thrifts raised approximately $1.3 billion in the months immediately following the enactment of FIRREA.[88] Dr. Cone further stated that despite a restriction upon

dividend payments to CFSB, Mr. Fail and CFSB could have raised capital through deferred interest debt instruments. Dr. Cone testified that in 1989 alone there were over $50 billion in deferred interest debt securities outstanding. In support of his opinion, Dr. Cone discussed Amazon.com's success in raising approximately $300 million in deferred interest debt in 1998 despite a lack of cash flow or assurance the company would be able to improve its earnings or meet its debt service obligations.[89]

Dr. Cone also expressed the opinion that the breaches did not increase CFSB's credit risk or plaintiffs' cost of raising capital. Dr. Cone asserted that uncertainty about whether a company will earn profits affects its value and risk. In the present case, however, where Bluebonnet earned profits but uncertainty only existed over when it would be permitted to pay those profits, such uncertainty would not impact the cost of raising capital.

### A. Credit Risk

Professor Miller's and Dr. Cone's testimony concerning credit risk was contradicted by fact testimony and exhibits provided at trial. A manual generated by FSLIC, entitled "Purchasing an Insolvent Savings Institution through the Federal Savings & Loan Insurance Corporation," stated that capital forbearances aided in reducing an acquirer's risk. According to the manual, FHLBB granted forbearances in order to give the new institution time to correct inherited problems without causing an undue risk to the investors or FSLIC.[90] Mr. Root testified that based upon his experience at FSLIC and as President of Bowery Savings Bank, the dividend forbearance would reduce the credit risk of CFSB and Mr. Fail.[91] In

---

86. Tr. at 5233–34.

87. *See id.* at 5249–50, 5257–58, 5424. Professor Miller described PIK notes as securities that do not require immediate cash payments. *Id.* at 5424. Dr. Kenneth Cone gave the following explanation: "[a] payment in kind means that when a coupon comes due, instead of giving the investor cash, ... you give the investor instead an additional bond or an additional note ... which in turn then pays interest at the same rate as the rest of the bond." *Id.* at 4381. As Dr.

Cone described, "[i]t's just a way of raising debt without immediately coming up with the cash interest." *Id.*

88. *Id.* at 4667, 4345–46.

89. *Id.* at 4364–65.

90. Pls.' Ex. 23, § 8, at 1.

91. Tr. at 1393, 1413.

addition, Mr. Shaw testified that he perceived the 1989 loan to be riskier than the 1988 loan due to the breaches.[92] In addition, Mr. Beisenherz, who negotiated the loans for Mr. Shaw, testified that this increased credit risk was reflected in the terms of the 1989 loan to CFSB.[93] Professor Miller also conceded that the breaches could cause a lender to view a loan as riskier.[94] This testimony corroborates the opinions expressed by plaintiffs' experts. The court holds that the forbearances would aid in reducing CFSB's credit risk, and agrees with plaintiffs' experts that the breaches increased the credit risk of CFSB and Mr. Fail.

### B. Capital Markets

The court did not find Dr. Cone's testimony concerning the abundance of thrift financing following FIRREA convincing.[95] Dr. Cone acknowledged that an exhibit underlying his opinion included offerings by thrifts after FIRREA of investment grade securities, conversions and public offerings. He admitted that these types of transactions were unrelated to the type of financing sought by plaintiffs following FIRREA.[96]

Dr. Cone, however, was unable to quantify the amount of capital raised in the last quarter of 1989 by thrift holding companies for infusion purposes. The court believes such information would more adequately represent the receptivity of the capital markets to the types of capital sought by Bluebonnet.

Conversely, Mr. Valeo and Mr. Plank focused on the availability in the market of the types of capital plaintiffs were seeking. For example, Mr. Valeo explained that all of the major equity transactions completed in the last quarter of 1989 and the first quarter of 1990 were mutual-to-stock conversions, which were not reflective of the conditions of the general equity markets at the time.[97] Mr. Valeo also testified that between 1989 and 1991 only one issuance of high-yield debt occurred. This was the type of debt which plaintiffs were seeking. The court finds the testimony of Mr. Valeo and Mr. Plank credible and persuasive, in part because of their experience in thrift financing during the time of FIRREA's enactment.[98] Dr. Cone and Professor Miller conceded they never assisted thrifts in raising capital.[99] The court

92. *Id.* at 1975–77, 2005–06.

93. *Id.* at 1825–26, 1934. The court found Mr. Shaw and Mr. Beisenherz to be credible witnesses. Both witnesses projected an honest and forthright demeanor while testifying.

94. *Id.* at 5385–86.

95. The court did not find Dr. Cone to be a persuasive witness. At times Dr. Cone appeared unwilling to respond to questions posed on cross-examination. For example, when asked by plaintiffs' counsel whether he relied upon the M & M propositions to render his opinion, Dr. Cone's response appeared to evade the question. After being re-asked the question for a third time, the court intervened and asked whether he relied upon the M & M propositions in rendering his opinion, in which Dr. Cone conceded that he did not specifically rely upon them. *Id.* at 4465–67. On another occasion, plaintiffs' counsel questioned Dr. Cone about empirical evidence underlying his opinion concerning the capital markets following FIRREA. Specifically, plaintiffs questioned Dr. Cone on plaintiffs' exhibit 1043, an exhibit identical to the exhibit relied upon by Dr. Cone, except that it classified all of the types of issuances that took place. Dr. Cone was asked to assume that of the $1.3 billion allegedly raised in the first quarter following FIRREA, approximately $13.3 million was similar to the type of

capital Bluebonnet was seeking. When asked whether he considered $13.3 million in capital issuances to be insubstantial, Dr. Cone responded he could not accept the premise of plaintiffs' counsel's question because he disputed the relevance of the distinctions made by plaintiffs' counsel. *See id.* at 4565. Dr. Cone's demeanor reflected negatively upon the veracity of his testimony.

96. *Id.* at 4565 (discussing Pls.' Ex. 1043).

97. *Id.* at 2681.

98. A representative of one potential investor testified to the effect the breaches had on his company's attempt to acquire Bluebonnet. Paul Halpern, an associate tax counsel of Guardian testified that Guardian recognized that the breaches created a liquidity problem at CFSB, and consequently made Mr. Fail and CFSB the lowest offer possible to purchase Bluebonnet. *See id.* at 2538–41, 2544. Plaintiffs ultimately rejected this offer. The court, nevertheless, recognizes that at least one potential investor chose not to invest in Bluebonnet and CFSB for reasons unrelated to FIRREA. There was conflicting evidence as to why ICH chose not to invest in 1989.

99. *See id.* at 4428, 5220.

accepts Mr. Valeo's and Mr. Plank's opinion that the breaches caused plaintiffs' inability to obtain financing outside of Mr. Shaw and his companies. *Accord Glendale Fed. Bank,* 43 Fed.Cl. at 402 (finding that after the passage of FIRREA the capital markets generally were closed to thrifts).

## C. Common Stock Dividends

Professor Miller's and Dr. Cone's testimony regarding the dividend irrelevance proposition and investors' concern over current cash flow was contradicted by probative evidence received at trial.[100] For example, the 1990 loan from Marquette to CFSB required CFSB to request that "[Bluebonnet] request in writing (with a copy to Lender) approval from OTS and all other necessary Governmental Authorities for the payment of dividends in accordance with the [CMA]."[101] It is clear that Mr. Shaw was concerned with OTS's restriction on the distribution of dividends to CFSB. In 1990, Mr. Shaw and Mr. Beisenherz met with OTS to discuss Mr. Shaw's desire to foreclose on Mr. Fail's shares of CFSB common stock because Mr. Fail and CFSB were in default on their interest payments. Mr. Shaw also told Mr. Fail by letter that the most important element to his providing Mr. Fail and CFSB with permanent financing was "the demonstration of a predictable dividend flow" from Bluebonnet.[102] Moreover, Mr. Shaw testified that he experienced pressure from his regulators in 1992 concerning the nonperformance on plaintiffs' loans. Mr. Franco testified on cross-examination that ICH weighed the effect of the breaches as part of a risk-based analysis in considering whether to loan additional capital to plaintiffs in 1989. On cross-examination, Professor Miller acknowledged that CFSB's balance sheet was very similar to a typical bank holding company as described in an FDIC examination manual. He also conceded that dividends were relevant to a typical bank holding company in making it creditworthy.[103]

The court accepts Mr. Valeo's and Mr. Plank's position concerning the importance of dividends to CFSB and investors. The court simply cannot agree with Professor Miller and Dr. Cone that CFSB would not care whether dividends remained within Bluebonnet.[104] CFSB was created for the purpose of

---

100. The court did not find Professor Miller's testimony persuasive. Professor Miller's testimony was shaped by his public policy goals. Professor Miller stated that one of the reasons he testified was that he was "gravely concerned" as a citizen and economist that the government has the right to change its laws and correct mistakes it may have made in the past. Professor Miller stated that when the government takes such action, it should not "be inhibited from correcting [its] mistakes by the fear that well, gee, if I do, I'll get hit with all these plaintiff strike suits, gotcha cases asking for punitive damages." *Id.* at 5271. Professor Miller, however, stated that parties should be permitted to recover measurable damages. Professor Miller also stated that his purpose for testifying was to ensure that future law students understood the correct economic analysis of the issues involved in Winstar cases. *Id.* at 5272. Professor Miller also demonstrated a contempt for the word "thrift." *Id.* at 5392–93. Such statements reduced his credibility as a witness.

101. Pls.' Ex. 210, Tab 3, § 7.13, at 31.

102. Pls.' Ex. 171.

103. Tr. at 5335–36.

104. The court was not persuaded by Dr. Cone's testimony regarding deferred interest debt. For example, the court finds his reference to Amazon.com to be inapplicable to this case. This example, which involves the capital raising efforts of a company in a different industry and decade, does not effectively demonstrate that plaintiffs could have raised capital through deferred interest debt. Moreover, Dr. Cone testified on cross-examination that if CFSB attempted to issue deferred interest debt following the breaches, it would need to disclose the restriction on dividends in its prospectus. *Id.* at 4503. When asked whether his research uncovered any holding companies which were able to issue a deferred interest debt instrument despite being forbidden from taking funds from its subsidiary, Dr. Cone responded that he did not specifically look for such an example. *Id.* Such information would have been more probative on this issue. The court. agrees with Mr. Valeo that investors would be unwilling to purchase such instruments because CFSB was completely dependent upon Bluebonnet for cash flow and had no foreseeable expectation as to when, if ever, OTS would permit Bluebonnet to distribute common stock dividends. *Id.* at 2707. The fact that OTS did not permit Bluebonnet to distribute common stock dividends until after plaintiffs sought an injunction in federal district court supports Mr. Valeo's assertion regarding the expectation of dividend distributions.

acquiring Bluebonnet, its sole asset. Common stock dividends from Bluebonnet were CFSB's main source of income. Mr. Fail and CFSB had time-sensitive, capital contribution requirements and were dependent upon Bluebonnet to assist in financing the acquisition. Accordingly, the court holds that the dividend irrelevance proposition does not apply in this case.[105]

As mentioned, the three breaches required plaintiffs to meet higher capital levels and eliminated the use of subordinated debt. The breaches, particularly the breach of the subordinated debt forbearance, destroyed the existing capital structure of Bluebonnet, thus requiring a new capital structure and a new plan for completing the capitalization. In order to meet its higher capital standards under FIRREA, Bluebonnet had to replace the $35 million in subordinated debt, sell approximately $150 million in assets, retain all earnings generated at that time ($29,157,-000 as of September 30, 1989), and raise $25 million for the 1989 infusion.[106]

The evidence demonstrates that the breaches, and particularly the breach of the dividend forbearance, were a substantial factor in causing Mr. Fail and CFSB to incur increased financing costs. With respect to the 1989 loan, Mr. Beisenherz testified it included contingent interest equal to 9% of CFSB's profits, together with an equity kicker, to reflect the increased credit risk of Mr. Fail and CFSB. This was not the result of conventional financing, as Mr. Shaw conceded he was in a better bargaining position and took advantage of Mr. Fail's breach-imposed condition. Mr. Shaw testified that

he knew Mr. Fail had no other option than to risk default.[107]

The breaches also impacted plaintiffs' financing terms in 1990. After unsuccessfully attempting to raise capital, plaintiffs sought permanent financing from Mr. Shaw to cover the 1990 infusion and refinance the 1988 and 1989 loans. In a letter dated April 16, 1990, Mr. Shaw informed Mr. Fail that "the demonstration of a predictable dividend flow" from Bluebonnet was the most important element in providing permanent financing to plaintiffs.[108] As of May 1990, Bluebonnet established a history of compliance with its new capital standards, and in August of that year had sufficient earnings to support a $25 million common stock dividend.[109] OTS, however, denied all of plaintiffs' requests between 1990 and December 1, 1992, to distribute common stock dividends.

This continual denial of requests to distribute common stock dividends had direct consequences upon CFSB and Mr. Fail. First, CFSB's lack of income from Bluebonnet common stock distributions left plaintiffs without a means in 1990 to repay debt or attract financing, placing them at risk of default to Mr. Shaw and ICH on their acquisition loans. In fact, in the Fall of 1990, Mr. Shaw and Mr. Beisenherz met with OTS officials to discuss the possibility of Mr. Shaw, through CNC, foreclosing on CFSB stock due to plaintiffs' nonperformance on their loan obligations.[110] Additionally, plaintiffs' failure to attract financing also placed them at risk of default to defendant by failing to meet their capital contribution obligations. Plaintiffs returned to Mr. Shaw in December 1990 to seek refinancing of their outstanding loans and for a

---

**105.** The court finds the dividend irrelevance proposition is inapplicable for other reasons. At the outset, the dividend irrelevance proposition by its very language applies to a shareholder's concern for dividends, not a lender's. Professor Miller also admitted that the M & M propositions relate to the operation of market forces and do not address the actions of a borrower or a lender. *Id.* at 5338–39. In addition, defendant's experts could not agree whether the M & M Propositions, to which the dividend irrelevance proposition belongs, apply in this case. Dr. Cone admitted his joint report with Professor Miller did not discuss the M & M Propositions and that he did not specifically rely upon them in giving his opinion in this case. *Id.* at 4466–67. Professor Miller, however, testified that the cost

of raising capital was a fundamental part of the M & M analysis of the capital markets. *Id.* at 5223–24.

**106.** *Id.* at 2427–31; Pls.' Ex. 137, at 46; Pls.' Ex. 163, at 4.

**107.** Tr. at 1977.

**108.** Pls.' Ex. 171.

**109.** Tr. at 4085–86; Pls.' Ex. 290 -D, Tab 1, at BL0000638E.

**110.** *Id.* at 1833–34.

loan for the 1990 infusion. Mr. Shaw, through Marquette, agreed to finance the 1990 infusion in return for the right to purchase CFSB stock by December 11, 1992, and Mr. Fail's receiving less compensation through a sale of CFSB stock than agreed to in the 1989 agreement.[111] The agreement also required plaintiffs to take out PIK notes to cover the interest on the new loan.[112]

Defendant's denial of dividend requests also affected the terms of the 1992 loan. After deciding in 1992 not to purchase Bluebonnet, Mr. Shaw demanded that plaintiffs address the outstanding loans due in December 1992.[113] At that time plaintiffs owed the Shaw affiliated companies approximately $140 million.[114] In addition, insurance regulators expressed concerns to Mr. Shaw over plaintiffs' nonperformance on their loans.[115] In an agreement reached on October 7, 1992, Mr. Shaw agreed to provide long-term financing in return for additional interest, fees and 50% of the ongoing net profits of CFSB.[116]

OTS did not decide to approve dividends until after plaintiffs filed suit in federal district court. Although OTS approved a number of Bluebonnet's long-pending dividend requests on December 1, 1992, it nevertheless restricted dividend payments to pay down acquisition debt to Shaw and prohibited plaintiffs from using dividends for other purposes.[117] The court finds that plaintiffs could not have obtained financing from another lender prior to December 31, 1992, in light of the fact of the amount of indebtedness to Mr. Shaw and OTS's restriction upon the use of the common stock dividends. The court finds it was reasonable for Mr. Fail to enter this agreement with Mr. Shaw.

### D. Factors unrelated to the breach did not cause plaintiffs' alleged damages.

Defendant alleges that the financial condition of Mr. Fail's insurance companies, including their involvement in litigation, contributed to plaintiffs' inability to obtain financing. Plaintiffs argue that the condition of Lifeshares or its affiliates did not cause their damages. In order to address these arguments, a brief discussion concerning Mr. Fail's insurance companies is necessary.

As mentioned, Mr. Fail owned MSL, which was located in Indiana, and Farm & Home, which was located in Arizona. During the time FIRREA was enacted, two of Mr. Fail's insurance companies, MSL and Farm & Home, began to experience financial difficulties. In mid–1989, the Indiana Insurance Commissioner expressed some concern over the Bluebonnet subordinated debt note held by MSL.[118] Nevertheless, the State and MSL always treated the note as an "admitted" asset under Indiana insurance law, as found by the District Court for the Southern District of Indiana.[119] On July 3, 1990, Farm & Home was placed under supervision by the State of Arizona for failure to comply with state regulations regarding asset ownership.[120] Three days later the State of Indiana placed MSL under supervision due to its financial condition.[121] Later that year, both companies were seized by state insurance regulators. In March 1992, the State of Arizona filed suit against Mr. Fail concerning his alleged mismanagement of Farm & Home. In April 1992, the State of Indiana similarly filed suit against Mr. Fail for his alleged mismanagement of MSL. Mr. Fail

111. Pls.' Ex. 154; Pls.' Ex. 214; Tr. at 1365–66, 1767, 1841–42, 1848–49.

112. *See* Pls.' Ex. 210, Tab 2, § 2.04, at BL000951E.

113. Tr. at 854.

114. *Id.* at 1508.

115. *Id.* at 1352–54, 1948, 2046.

116. Pls.' Ex. 261; Pls.' Ex. 262; Tr. at 858–59.

117. Pls.' Ex. 266.

118. Tr. at 1088; Def.'s Ex. 132.

119. Pls.' Ex. 313, at 6–7.

120. Def.'s Ex. 268.

121. Def.'s Ex. 888.

eventually entered settlement agreements in these lawsuits.[122]

The court finds that the condition of Lifeshares and the litigation involving Farm & Home and MSL did not cause plaintiffs' damages. Credible testimony established that Lifeshares did not purchase subordinated debt in 1989 because it no longer qualified as regulatory capital and would not have satisfied the new capital requirement if plaintiffs used subordinated debt for any portion of the 1989 infusion.[123] In addition, plaintiffs proved that the $35 million in subordinated debt purchased by MSL did not affect the terms under which plaintiffs borrowed from CNC. The terms of the agreement which address subordinated debt were not performed and were intended to improve the collateral position of CNC and ICH.[124] With respect to the 1990 infusion, plaintiffs presented testimony that MSL and Farm & Home did not purchase subordinated debt because plaintiffs already owed approximately $80 million to Mr. Shaw and there would have been no material impact if one of Mr. Fail's insurance companies, or an unaffiliated third party, purchased subordinated debt.[125] The court found this testimony reasonable and persuasive.

Defendant also alleges that Mr. Fail's reputation caused his inability to obtain financing. The court finds this allegation to be without merit. On cross-examination, Mr. Dirk Adams, head of the corporate development department of World Savings, testified that Mr. Fail's reputation had no impact on his company's decision not to purchase Bluebonnet.[126] In addition, Mr. Kurt Bolin, an operations manager for G.E. Capital, Inc., who met with Mr. Fail and one of his representatives in 1989, proved that Mr. Fail's reputation could not have played a role in G.E. Capital's decision not to invest in Bluebonnet. Although Mr. Bolin testified that an article concerning Mr. Fail that appeared in the New York Times in 1989 formed the basis of G.E. Capital's decision not to invest, Mr. Bolin conceded on cross-examination that the article upon which he relied was not published until 1990, well-after G.E. Capital made its decision.[127]

Accordingly, the court finds that defendant's breaches were a substantial factor in causing plaintiffs' alleged damages.[128]

## IV. Reasonable Certainty

 The law of this circuit requires plaintiffs to prove the amount of their damages with reasonable certainty. See Wells Fargo, 88 F.3d at 1023. "[W]here responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision . . . ." Electronic & Missile Facilities, Inc. v. United States, 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969). "Certainty is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages." Locke v. United States, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960). Nevertheless, contract law precludes recovery for speculative damages. San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed.Cir.1997); Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed.Cir.1992).

---

122. Tr. at 1050, 1064.

123. Id. at 1345–46, 1165–67, 3018.

124. Id. at 1940, 1981–82, 1829–33.

125. Id. at 1171–72, 1774–75. Defendant contends that Mr. Carneal conceded that the lawsuits involving MSL and Farm & Home negatively affected Mr. Fail's ability to raise capital in 1992. See Def.'s Br. at 50. Defendant's contention lacks merit. Mr. Carneal merely speculated that the litigation could have had a negative impact on plaintiffs' capital raising efforts. See Tr. at 1717–19. He stated, however, that plaintiffs did not attempt to raise capital in 1992 because Mr. Shaw was attempting to acquire Bluebonnet. Id. at 1777–78. The court also notes that no potential investors who testified stated that litigation involving Lifeshares or its affiliates dissuaded it from financing the acquisition. See id. at 2586, 3565–66, 3569–70, 3678–3701.

126. Id. at 3696–98, 3704.

127. See id. at 3568–73.

128. Although plaintiffs were unable to find a tax-advantaged partner during this time, this does not change the court's opinion that the breaches were a substantial factor in causing plaintiffs' to incur additional financing costs.

Plaintiffs claim they have proven with reasonable certainty that the breaches caused them to incur $175,882,000 in damages.[129] As mentioned, this number is comprised of: (1) additional interest; (2) additional loan fees paid to lenders; and (3) the cost of the EBA and its successor agreements.

## A. Professor Well's Model

Professor Weil's model measures damages by calculating the difference between the actual net financing costs of Mr. Fail and CFSB and the net financing costs they would have incurred in the absence of the breach (but-for costs). In calculating plaintiffs' actual costs, Professor Weil relied upon corporate financial records of CFSB and Bluebonnet, plaintiffs' financial statements, consolidated statements, dividend declarations, loan agreements and payment records. Professor Weil determined CFSB's actual net financing costs were $26,346,000, while Mr. Fail's actual net financing costs amounted to $54,375,000.

Professor Weil concluded that the amount due to CNC from Mr. Fail under the EBA is $126,997,808 as of September 30, 1998. Professor Weil, however, did not calculate the value of CNC's economic benefits, but instead relied upon a one-page document referred to as the "Memorandum Account" (Memo Account), which was calculated by accountants for CFSB,[130] as well as the SAREBA. Professor Weil opined that the EBA was a cost of financing. Dr. Cone conceded this point.[131] A portion of the EBA-related damage included Mr. Fail's payment of $5,400,392 to CNC.[132] Assuming the court grants CFSB's alleged damages, plaintiffs contend Mr. Fail is entitled to 49% of that amount. Professor Weil included this figure, which amounts to $11,957,000, in his model.

Professor Weil determined CFSB's but-for financing costs are $1,944,000 and Mr. Fail's but-for financing costs are $47,250,000. In making these calculations, Professor Weil made certain assumptions concerning the actions of Bluebonnet, CFSB and Mr. Fail in the but-for world. These assumptions are: (1) Bluebonnet performs as it did in the actual world except that it distributes common stock dividends equal to 50% of the fiscal year net income to CFSB; (2) CFSB pays dividends to Mr. Fail sufficient to pay his debt service and other expenditures made in the actual world; (3) CFSB makes the same expenditures and investments as in the actual world; (4) CFSB borrows at 13.5%, the market rate at the time the contract was entered, and pays down its debt as quickly as possible; (5) Mr. Fail borrows $35 million from Bankers Life at 13.5% and repays his debt as in the actual world; (6) if CFSB has additional cash, it invests it at a 5% rate; (7) Mr. Fail is not required to enter the EBA.[133]

Professor Weil next measured CFSB's damages by calculating the difference between its actual financing costs, which are $26,346,000, and its but-for financing costs ($1,944,000), which amounts $24,402,000. Professor Weil then calculated the difference between Mr. Fail's actual non-EBA financing costs, which were $54,375,000, and his but-for non-EBA financing costs ($47,250,000), arriving at $7,125,000. Professor Weil then added this number to Mr. Fail's EBA financing costs ($144,355,000), arriving at $151,480,000.

Defendant asserts that plaintiffs have failed to prove their alleged damages with reasonable certainty. Significantly, defendant claims that plaintiffs' model contains several flaws which renders their entire damage claim speculative. First, defendant avers that plaintiffs have failed to prove they could have achieved the financing terms assumed in their but-for world. With respect to plaintiffs' non-EBA damages,[134] defendant

---

129. Plaintiffs' damage award is limited by settlement in prior district court litigation to $136,075,000.

130. *See* Tr. at 278–81.

131. *Id.* at 4618.

132. *See* Pls.' Ex. 290 R, RLW-2, Tab 18, at BL0004672E. According to Professor Weil, CNC

has the right to unilaterally demand payment of $21.7 million. Tr. at 283.

133. *Id.* at 217–18; 222; Pls.' Ex. 290 R, RLW-5, line 14.

134. Plaintiffs' damage model can be broken down into two components: (1) Mr. Fail's and CFSB's non-EBA financing costs, which amount

contends that this essentially is a claim for prejudgment interest and thus cannot be recovered. Defendant also argues that Professor Weil invalidly assumes that plaintiffs would have repaid their debt as quickly as possible in the but-for world. Concerning Mr. Fail's EBA-related damages, defendant alleges that plaintiffs failed to establish when Mr. Fail and Mr. Shaw entered the EBA, primarily because many of plaintiffs' fact witnesses gave conflicting testimony on this issue. Defendant also maintains the agreement was entered in 1989, and posits that Professor Weil's damage model, which relied upon a 1992 conveyance, improperly measures damages. Defendant also asserts that plaintiffs have not sufficiently explained the derivation of Mr. Fail's EBA-related costs to enable the court to determine how they calculated the value of the economic benefits owed to CNC. Defendant further avers that Professor Weil improperly calculated the value of the economic benefits from a 1998 perspective, rather than from 1992 when it allegedly was entered into.

### 1. Plaintiffs' but-for costs

The court begins its analysis by examining the portion of Professor Weil's model that pertains to plaintiffs' but-for costs. As mentioned, Professor Weil assumes plaintiffs could have borrowed $78 million between 1988 and 1990 at an interest rate of 13.5%. Significantly, the 13.5% rate is incorporated into every year of Mr. Fail and CFSB's but-for financing costs. Thus, if plaintiffs cannot prove that they could have raised this $78 million at 13.5%, their damage model would not work because their but-for world would not be achievable.

Professor Weil assumes, and defendant does not dispute, that Mr. Fail would have obtained a $35 million short-term loan from Bankers Life. With respect to the 1989 and 1990 infusions, Professor Weil assumes CFSB would have borrowed $15,756,000 in 1989, and $27,433,000 in 1990, to satisfy its capital infusion obligations for those years. No fact witnesses testified they would have loaned CFSB approximately $43 million at

13.5% to fund these infusions. Mr. Valeo testified that in December 1989 CFSB had the debt service capacity to borrow $51 million at 12.5% to 13.5% to satisfy its 1989 and 1990 infusion obligations.

Mr. Valeo opined that he could have helped CFSB raise capital for the 1989 and 1990 infusions by locating investors willing to lend it $50 million. Significantly, Mr. Valeo conceded that he would have wanted the $35 million loan to be made long-term before his investors would invest the $50 million. Mr. Valeo admitted that he never contemplated his investors would refinance the Bankers Life loan. No fact witnesses testified that they would have refinanced the Bankers Life loan. Additionally, plaintiffs did not produce any documentary evidence to suggest that the $35 million would have been refinanced and made long-term. Moreover, plaintiffs' inability to obtain long-term financing in 1989 for the Bankers loan cast significant doubt that they could have done so in the same capital markets in the absence of the breach. In the last quarter of 1988, there was only one issuance of high-yield debt, which amounted to $50 million. In the first two quarters of 1989, there were no high-yield debt issuances.[135] Without long-term financing for this loan, the court finds it unlikely Mr. Valeo could have found investors willing to finance the 1989 and 1990 infusions. Consequently, the court finds this evidence is insufficient to establish that plaintiffs would have obtained the capital financing assumed in their model absent the breach. *See Quiman, S.A. de C.V. v. United States*, 39 Fed. Cl. 171, 185 (1997), *aff'd*, 178 F.3d 1313 (Fed. Cir.1999) (Table) (finding plaintiff's damage claim speculative because it failed to identify any potential customers who would have purchased its fetal bovine serum absent the breach); *LaSalle Talman Bank*, 45 Fed.Cl. at 93–95 (finding plaintiff's contention that it would have undergone a merger-conversion and generated profits absent the breach was too speculative due to numerous unfounded assumptions regarding the parties' negotiations and regulatory approval). The absence

---

to $31 million; and (2) Mr. Fail's EBA-related costs, which amount to $132,000,000.

**135.** *See* Pls.' Ex. 308, Ex. 6.

of this critical component of plaintiffs' model prevents the court from making a "fair and reasonable approximation of the damages." *Locke,* 283 F.2d at 524. Accordingly, the court finds that plaintiffs have failed to prove their alleged damages with reasonable certainty.

Assuming, *arguendo,* that plaintiffs could have raised the capital included in their but-for world, Professor Weil's model contains other infirmities which render plaintiffs' damage claim speculative. The court will discuss these infirmities below.

### a. Plaintiffs' non-EBA damages

As mentioned, defendant claims that the court cannot award plaintiffs' their non-EBA damages because they amount to prejudgment interest. Plaintiffs counter that the financing costs they seek to recover are substantive damages and not prejudgment interest. Relying upon *Bell v. United States,* 186 Ct.Cl. 189, 404 F.2d 975, 984 (1968), *Manko v. United States,* 830 F.2d 831, 837 (8th Cir.1987), and *Peoria Tribe of Indians of Okl. v. United States,* 390 U.S. 468, 470–71, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968) (*Peoria*), plaintiffs claim that the statute barring recovery of prejudgment interest does not affect "damages on the substantive claim."

 "Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof." 28 U.S.C. § 2516(a)(1994). "In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." *Library of Congress v. Shaw,* 478 U.S. 310, 314, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). Prejudgment interest "is simply compensation for the use or forbearance of money owed." *Transmatic, Inc. v. Gulton Indus.,* 180 F.3d 1343, 1347 (Fed.Cir.1999); *accord Detroit Int'l Bridge Co. v. United States,* 32 Fed.Cl. 225, 228 (1994), *aff'd,* 64 F.3d 676 (Fed.Cir.1995) (Table) (interest is defined as " 'compensation allowed by law or fixed by the parties for the use or forbearance or detention of money . . . [or the] [b]asic cost of borrowing money or buying [on][an] installment contract' ") (quoting BLACK'S LAW DICTIONARY 729 (5th ed.1979)).

 Plaintiffs' non-EBA damages seek interest and fees on money borrowed from Mr. Shaw and his affiliates to finance the Bluebonnet acquisition. The first line in Professor Weil's model is labeled "interest expense," and calculates CFSB's interest payments between 1988 and 1998, which amounts to $42,398,000. The law of this circuit prohibits plaintiffs from recovering interest paid on money borrowed as a result of defendant's breach. *See Myerle,* 33 Ct.Cl. at 25 (interest paid on money borrowed because of government delay of payment could not be recovered); *J.D. Hedin Constr. Co. v. United States,* 197 Ct.Cl. 782, 456 F.2d 1315, 1330 (1972) ("[i]nterest paid on bank loans made because of financial stringency resulting from a breach by the [g]overnment of a contract between it and the borrower is not recoverable as an item of damage"); *Marshall v. United States,* 143 Ct.Cl. 51, 164 F.Supp. 221, 224 (1958) ("[i]t is . . . well-established that interest on borrowed money is not recoverable in suits against the [g]overnment unless it is called for in the contract itself or in the governing statute"); *see also Ramsey,* 101 F.Supp. at 356.

Plaintiffs' reliance upon *Bell, Manko* and *Peoria* is misplaced. *Bell* involved a contractor's attempt to recover additional interest on money it borrowed to perform additional work in an attempt to comply with defective contract specifications. *Bell,* 404 F.2d at 984. The court permitted the contractor to recover additional interest incurred, finding it was not a result of the breach but rather a change compensable under the changes clause of the contract. *Id. Peoria* involved the government's breach of a treaty under which it was required to invest certain funds and pay the annual income to the Peoria Indian Tribe. *Peoria,* 390 U.S. at 469, 88 S.Ct. 1137. As a result of the breach, the government invested a smaller sum, which reduced the amount of annual income. *Id.* at 471, 88 S.Ct. 1137. The court held that the Tribe's damages consisted of the reduction in annual income, and such recovery did not violate the rule against prejudgment interest.

*Id.* at 472, 88 S.Ct. 1137. In *Manko,* the United States Court of Appeals for the Eighth Circuit held that lost pension earnings incurred by a plaintiff injured from a tort committed by the United States did not amount to prejudgment interest under the Federal Tort Claims Act. *Manko,* 830 F.2d at 837. The court reasoned that lost pension earnings served the same purpose as lost pension contributions and lost wages. *Id.* None of these cases are dispositive on the issue presented in the present case. Plaintiffs have not cited any statutes or contract-based provisions entitling them to recover this interest. Accordingly, the court finds that plaintiffs cannot recover their non-EBA damages.

Assuming, *arguendo,* that these costs do not constitute prejudgment interest, Professor Weil's model contains a number of flaws which render plaintiffs' damage claim speculative. For example, in calculating CFSB's but-for costs, Professor Weil assumes that CFSB would have paid down debt as quickly as possible. In the actual world, however, CFSB voluntarily maintained debt, which as of December 31, 1998, amounted to $1,154,-885.[136]

Plaintiffs assert that they retained cash within CFSB, rather than repaying debt as quickly as possible, because of a source of financial strength requirement that existed within OTS. According to plaintiffs, OTS would not allow Bluebonnet to distribute dividends unless CFSB had sufficient capital to administer financial assistance to Bluebonnet should it run into financial difficulties. At trial, Mr. Oates attempted to support this theory, testifying that OTS displayed a hardening attitude towards Bluebonnet and had given CFSB unsatisfactory ratings because it was not a source of financial strength to the thrift.[137] Mr. Brick, however, testified that OTS did not maintain a source of financial strength requirement for thrift holding companies.[138] According to Mr. Brick, OTS was concerned that CFSB would affect the finan-

cial condition of Bluebonnet by attempting to remove capital via dividend distributions to repay its debt. Mr. Brick, however, did concede that substantial cash balances within CFSB of approximately $25–$50 million probably would have negated the purpose of the RB 3a–1 designation and made it more difficult for OTS to deny the payment of dividends. Based upon this testimony, the court finds that no source of financial strength requirement existed. At best, Mr. Brick conceded that regulators were indirectly concerned with CFSB's financial condition and its ability to affect the financial condition of Bluebonnet.

Even assuming OTS did maintain a source of financial strength requirement, by 1993, Bluebonnet was well-capitalized, achieving a core capital ratio of 7.65%. Additionally, CFSB received over $110 million in common stock dividends from Bluebonnet that year.[139] The court finds that $110 million would have satisfied regulators that OTS was a source of financial strength to Bluebonnet. CFSB, nevertheless, maintained debt through 1998 despite having received over $264,000,000 in common stock dividends from Bluebonnet. Plaintiffs did not explain why CFSB maintained debt after 1993. Accordingly, because CFSB maintained debt in the actual world until 1998, the court finds Professor Weil's assumption is speculative.

Moreover, Professor Weil conceded that despite his intention to apply the source of financial strength requirement in both the actual and but-for worlds, he neglected to incorporate this requirement in the but-for world.[140] Professor Weil did not provide a satisfactory explanation as to why he excluded this requirement. Had he applied this requirement, CFSB would have had to retain excess capital. Consequently, it would have had less cash with which to repay debt, and thus would have maintained debt over a longer period of time. This retention of cash presumably would have impacted the amount of dividends to be distributed to Mr. Fail,

---

136. Pls.' Ex. 290 S, Tab 1.

137. Tr. at 3041.

138. *Id.* at 4135.

139. *See* Pls.' Ex. 290 B, Tab 7; Pls.' Ex. 290 R, RLW–4, Tab 24.

140. Tr. at 447–49.

thus changing his but-for financing costs. Professor Weil conceded that under his model the repayment of debt over a longer period of time in the but-for world would decrease plaintiffs' damages.[141] Professor Weil neither discussed how much capital would have to be retained nor recalculated damages after including that figure. Under such circumstances, the court cannot make a reasonable approximation of how much capital CFSB would have retained or of plaintiffs' damages. Accordingly, the court finds that plaintiffs have failed to prove their non-EBA damages with reasonable certainty.

### b. EBA damages

■ As discussed, defendant argues that plaintiffs failed to prove when Mr. Fail and Mr. Shaw entered the EBA, and asserts they entered the EBA in 1989. The 1989 loan agreement gave CNC a right to 50% of the proceeds of a sale of Bluebonnet, as well as the right to receive contingent interest based upon CFSB's net earnings.[142] Mr. Fail repaid that interest when he refinanced that loan in 1990. In contrast, the 1992 agreement provided for 50% of CFSB's economic benefits.[143] This agreement was further detailed in the January 25, 1993 loan agreement. Accordingly, the court finds that Mr. Fail and Mr. Shaw entered the EBA in 1992.

The court next examines plaintiffs' calculation of Mr. Fail's EBA-related damages. These damages are measured through a calculation which essentially is related to the arithmetic addition of 49% of CFSB's profits from 1988 to 1998. These calculations are incorporated in the Memo Account. The document lists a series of terms found on the left hand side of the page, and the corresponding calculations located on the right hand side. For example, the first two items listed provide:

| | | | |
|---|---|---|---|
| (i) | 49% of Base Amount. | 75,258,350 x .49 | 36,876,592 |
| (ii) | plus, the Relevant Percentage multiplied by [CFSB's] periodic Cumulative Net Earnings.[144] | 236,183,735 x .49 | 115,730,030 |

. . . .

The Memo Account contains an additional eleven items flanked by their corresponding calculations. The terms are found within the SAREBA. The Memo Account lists CNC's share of CFSB's profits as $126,997,808.

Patricia Robinson, Deputy Counsel for CFSB and author of the SAREBA and the Memo Account, provided testimony to explain the genesis of the Memo Account and the calculation of plaintiffs' EBA-related damages. Ms. Robinson testified that she prepared the text within the Memo Account but was not responsible for the calculations included therein. According to Ms. Robinson, she simply pulled text from the SAREBA and directed one of CFSB's accountants to fill in the financial information and perform the necessary calculations. She stated that after the calculations were completed, she would provide a copy of the Memo Account to Mr. Fleischman, General Counsel of CNC.

It became clear at trial that Ms. Robinson could not fully explain the basis for all the costs contained in the Memo Account. The Memo Account contains the following warning: "This schedule has been prepared in accordance with the provisions of the SAREBA. A full understanding of the SAREBA is a prerequisite to an understanding of this schedule."[145] When asked on cross-examination whether she had a full understanding of the SAREBA, Ms. Robinson answered that she had a general understanding of it. Ms. Robinson further explained that she believed she had a sufficient understanding of the SAREBA to generate the calculations contained in the Memo Account. The court disagrees. At trial, the court questioned Ms. Robinson on her knowledge of the SAREBA:

THE COURT: The reference to 49 percent of base amount. In plain English, what's the base amount?

THE WITNESS: Well, that's an interesting question. The SAREBA itself defines

141. *Id.* at 445–56.

142. Pls.' Ex. 154; Pls.' Ex. 156, Tabs 7–8; *see* Tr. at 1100–01, 1765–66; *accord* 1848–49.

143. *See* Pls.' Ex. 261; Tr. at 1823–27, 1839–41, 1848–49, 1853.

144. Pls.' Ex. 306.

145. *Id.*

the base amount as that number, 75,258,-350. So when I calculate it, I look back to the definition of "base amount," and that's what I plug in and multiply times 49 percent.

THE COURT: Do you know what the base amount consists of?

THE WITNESS: Well, no. I can tell you that during my deposition, I got actually a better view of that than I ever had. The definition of base amount in the EBA is a little bit further descriptive, but not much. I could read that definition to you if you'd like.

THE COURT: All right. Please do.

THE WITNESS: It says "base amount means $75,258,350, which amount reflects in part, CFSB's retained earnings at December 31, 1992 of $129,326,790, as set forth in its unaudited financial statements as of that date." And it has a parenthetical, "and which such amount will be adjusted upward or downward to reflect the adjustments of CFSB's retained earnings as of December 31, 1992." Now, when the EBA was amended into the AREBA, it had a $75 million figure, so the parenthetical part dropped off.

THE COURT: You had been taking that figure and just continuing.

THE WITNESS: Right, because that's what the terms of the agreement called for, so I don't really know the real history.[146]

Ms. Robinson could not explain what other "part" comprises the Base Amount. No other fact witnesses explained the origin of these amounts.[147]

Unfortunately, the SAREBA and its predecessors fail to describe the how the parties derived the $75 million incorporated in the Base Amount. In addition, none of the documents explain what other "part" comprises the Base Amount. The documents contain a series of definitions and references to finan-cial statements, but do not explain how some of the numbers included as definitions are derived. Although Professor Weil concluded that the EBA-related costs were a cost of financing, the court notes that "opinion evidence is only as good as the facts upon which its is based." *Loesch v. United States*, 227 Ct.Cl. 34, 645 F.2d 905, 915 (1981). The court did not find the Memo Account or Ms. Robinson's testimony reliable in establishing Mr. Fail's EBA-related costs. Consequently, the court holds that plaintiffs' EBA-related damages are speculative.[148]

### Conclusion

The court concludes that plaintiffs' proved that their claimed damages were reasonably foreseeable to FHLBB at the time the parties entered the contract. Plaintiffs also proved that the three breaches were a substantial factor in causing these claimed damages. The court, however, holds that plaintiffs failed to prove their alleged damages with reasonable certainty. Therefore, plaintiffs' request for damages must fail. Accordingly, the clerk is directed to enter judgment for defendant. No costs.

IT IS SO ORDERED.

---

146. Tr. at 2206–07.

147. Moreover, Ms. Robinson could not explain why CFSB's "Cumulative Periodic Net Earnings," decreased by approximately $2.3 million within one year. *Id.* at 2197; *compare* Pls.' Ex. 290 D, Tab 8 with Pls.' Ex. 306.

148. CFSB's financial statements reveal that to date it has paid CNC $5,400,392.15. Pls.' Ex. 290 R, RLW–2, Tab 18, at BL0004672E. Mr. Shaw testified that CNC received from plaintiffs approximately $5 million in EBA-related payments. *See* Tr. at 2004. Nevertheless, because plaintiffs failed to establish their but-for world, they are not entitled to this cost.